626 So.2d 169 (1993)
Guillermo ARBELAEZ, Appellant,
v.
STATE of Florida, Appellee.
No. 77668.
Supreme Court of Florida.
September 23, 1993.
Rehearing Denied November 17, 1993.
*170 Reemberto Diaz of Diaz & Batista, P.A., Hialeah, for appellant.
Robert A. Butterworth, Atty. Gen., and Fariba N. Komeily, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
Guillermo Arbelaez appeals his convictions for first-degree murder and kidnapping and his death sentence. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. We affirm both Arbelaez's convictions and his sentence.
The evidence in the instant case revealed the following pertinent facts. Arbelaez met Graciela Alfara at the Cafeteria Blanquita where she worked as a waitress. Over the period of several months, Arbelaez and Graciela became acquainted and sometime around January 15, 1988, Arbelaez moved into a house shared by Graciela, her two teenage daughters, five-year-old son, and nineteen-year-old cousin. Arbelaez paid Graciela $150 a month rent for a room he shared with her cousin. Shortly after moving into the home, Arbelaez and Graciela became intimate. This relationship, however, soon ended after Graciela accused Arbelaez of touching one of her daughters on the breast. According to Graciela, she told Arbelaez to move out of the house by February 15, 1988. In contrast, Arbelaez indicated that he and Graciela were to be married on February 15, 1988.
On February 13, 1988, Arbelaez, returning from work around 4:30 p.m., stopped by the Cafeteria Blanquita to give Graciela a ride home. Graciela, however, had left with another man. Arbelaez drank a beer and then went home to wait for Graciela to return. Close to midnight, Graciela returned home and kissed her companion good night as Arbelaez watched from a peephole in the door. As Graciela entered the house, Arbelaez grabbed her by the arm and started an argument. Graciela told Arbelaez that she did not love him and that he should move out the next day. After the argument, Graciela went to her room to sleep. Arbelaez stayed in the living room.
That next morning around 7 a.m., Graciela went to wake her cousin, Harlam Alfara, to go to work. She went past Arbelaez without speaking to him. After waking Harlam, Graciela *171 went back to sleep. Harlam began preparing for work while Arbelaez and Julio Rivas, Graciela's five-year-old son, watched television in the living room. As Harlam started to go to the shower, he asked if Arbelaez intended to go to work. Arbelaez answered no and when Harlam returned to the room Arbelaez and Julio were gone. At approximately 7:30 a.m., while Graciela was sleeping in her room, Arbelaez took Julio and left the house.
Arbelaez drove his car to the Cafeteria Blanquita for a cup of coffee. While Julio remained in the car, Arbelaez ordered a cup of coffee from the waitress, Francisca Morgan. Morgan testified that Arbelaez appeared calm and normal. Arbelaez joined his friend Juan Londrian and drank the coffee. Londrian also testified that Arbelaez appeared calm and normal. As they drank their coffee, Arbelaez told Londrian that Graciela was seeing another man, and he stated that he was going to do something that would assure "that bitch is going to remember me for the rest of her life." Londrian understood that Arbelaez was referring to Graciela by that statement.
After he drank the coffee, Arbelaez left the cafeteria and drove around for a couple of hours. At approximately 10:15 a.m., Arbelaez stopped his car at a convenience store in Key Biscayne and called Graciela to speak with her. One of Graciela's daughters answered the phone, but Graciela refused to speak with Arbelaez. Arbelaez then drove to the crest of the Powell Bridge on the Rickenbacker Causeway and stopped, exited his car, and lifted the hood, pretending that the car had broken down. He called to Julio, grabbed the boy by the arms, and threw the child off the bridge into the water seventy feet below. Arbelaez quickly closed the hood and fled the scene. He abandoned his car in a Coral Gables neighborhood and ran to the home of a friend, Pedro Salazar, and his family.
Arbelaez confessed to Pedro Salazar that he "shook" the child and "squeezed the boy's neck." He also told Pedro that he had thrown the child off a bridge because he wanted revenge against the child's mother. While Arbelaez was speaking with him, Pedro noticed a scratch on Arbelaez's neck. The Salazars loaned Arbelaez some money and drove him to the airport where he bought an airline ticket to Puerto Rico under an assumed name. After arriving in Puerto Rico, Arbelaez contacted his family in Colombia for money. His family wired him some money, and Arbelaez returned to Colombia.
On February 14, 1988, at approximately 3 p.m., a security officer for a high-rise located on Brickell Avenue spotted a child floating in the water. The security officer and a coworker jumped into the water and retrieved the child. Police and fire rescue workers arrived at the scene quickly, but efforts to revive the child were unsuccessful. Police officers at the scene took photographs of the child. Homicide Detective Martinez, who was also present at the scene, took the photographs to Graciela's residence because she had reported a missing child that afternoon. Graciela identified the dead child as her five-year-old son, Julio Rivas. At that time, Graciela also informed the police that Arbelaez could not be found.
On February 15, 1988, Martinez found Arbelaez's car abandoned in Coral Gables near the Salazars' home. Inside the car Martinez found that the dashboard had been pulled apart and damaged. The air conditioning panel was off the dashboard, and the knob of one of the switches was on the floor. The damage was consistent with something coming into contact with the panel. On February 18, 1988, an arrest warrant was issued for Arbelaez; however, the police could not find Arbelaez.
On March 16, 1988, Martinez asked Detective Cadavid to contact Arbelaez's family in Medellin, Colombia, because Cadavid was from Medellin and spoke the local dialect. Cadavid called Arbelaez's mother and identified himself as a homicide detective with the City of Miami Police Department and asked to speak to Arbelaez if he was home. Arbelaez answered the phone and identified himself. Cadavid identified himself again as a detective in the City of Miami Police Department in the United States and stated that he needed to speak to Arbelaez about a problem in Miami. Arbelaez responded that he knew he was in trouble, but that he could not *172 return to the United States because of a lack of documentation and money. Cadavid offered to help with proper documentation through the American Embassy in Bogota, Colombia, and to provide Arbelaez airfare to the United States. Cadavid also told Arbelaez that he would have to stand trial before a judge, but did not mention the possibility that Arbelaez could get the death penalty. Arbelaez gave Cadavid another phone number where he could be reached in the future.
Following his conversation with Arbelaez, Cadavid called the American Embassy in Bogota. Cadavid spoke with Federal Bureau of Investigation Agent Rubin Munoz, a liaison officer for law enforcement officers in the United States and the host country, about arranging for Arbelaez to obtain the proper documentation in order to leave Colombia. After speaking with Munoz, Cadavid called Arbelaez back and spoke with Arbelaez's brother. Cadavid again identified himself as a detective from Miami. Arbelaez's brother indicated that Arbelaez would return to the United States as soon as he could obtain proper documentation and a plane ticket. The brother also told Cadavid that Arbelaez suffered from chronic epileptic seizures and had been through psychiatric treatment in Colombia when he was eighteen to twenty years old. Cadavid then gave Arbelaez's brother a phone number for Arbelaez to call Munoz at the American Embassy in Bogota. Thereafter, Cadavid had no contact with Arbelaez.
On March 24, 1988, Martinez contacted Arbelaez with the phone number he got from Cadavid. Martinez identified himself to Arbelaez and told him that there was a warrant for his arrest for the homicide of Julio Rivas. Martinez also provided Arbelaez with Munoz's telephone number at the American Embassy in Bogota and told him that Munoz would assist him in obtaining a visa. Martinez also gave Arbelaez the Miami Police Department's telephone number.
Arbelaez telephoned Munoz in Bogota following his conversation with Martinez. Arbelaez told Munoz that he had spoken to detectives in Miami and that he had some problems in the United States. He indicated to Munoz that he had left Miami because of fear, but that his family had convinced him to return and face prosecution. Arbelaez further told Munoz that he had caused the death of his girlfriend's son. He explained that he had been living with the mother of the child and that he and the woman had planned to get married. Arbelaez stated that he had an argument with the child's mother after seeing her kiss another man, and the mother told Arbelaez that she did not love him. Arbelaez then told Munoz, "As a Latin you would understand the best way to get to a woman is through her children." Thus, Arbelaez stated, he threw the woman's son off the bridge in order to drown the boy.
Munoz told Arbelaez that he would need a Colombian passport before he could procure a visa for his trip to Miami. Munoz advised Arbelaez that he could not assist him in obtaining a Colombian passport and that Arbelaez would have to handle that himself. During the course of the conversation, Arbelaez indicated to Munoz that he could not afford an attorney for the criminal charge. Munoz told Arbelaez that the court would appoint him an attorney and that he would have the same rights and privileges as any United States citizen. Munoz initiated the next two telephone conversations with Arbelaez regarding the progress in obtaining a Colombian passport. Ultimately, Munoz did not assist or obtain a visa for Arbelaez. In fact, Munoz's only contact with Arbelaez was through telephone conversations, and Munoz never met with Arbelaez.
Between March 24, 1988, and April 11, 1988, there were several telephone conversations between Arbelaez and Martinez. Arbelaez initiated some of this contact by calling Martinez at the Miami Police Department. In one of those telephone conversations, Arbelaez told Martinez that he was represented by an immigration attorney in Miami who was in possession of his identification card which was needed in order to obtain his Colombian passport. He asked Martinez to contact the attorney and to obtain the identification card for him. Martinez contacted the immigration attorney, but the attorney did not have possession of the card. During the conversation, the immigration attorney informed Martinez that Arbelaez had said *173 that he was being represented by an attorney named Martinez. Martinez immediately called Arbelaez to ensure that Arbelaez understood that Martinez was a police officer. Arbelaez said that he was not confused and that he understood that Martinez was a police officer.
The remainder of Martinez's telephone calls with Arbelaez involved periodic checks on Arbelaez's progress in obtaining the proper documentation to enter the United States. During one of these telephone conversations, Arbelaez requested confidentiality but only in terms of media coverage. Arbelaez also inquired about the possibility of working in prison. Martinez responded that work was available, but at trial disputed that he promised Arbelaez work in prison. Finally, Arbelaez telephoned and stated that he had the proper documentation for the trip to the United States. Martinez purchased the ticket and arranged for it to be transferred to the airport in Colombia. Arbelaez picked up his ticket at the airport in Colombia and boarded the plane for Miami alone, unaccompanied by any law enforcement agents.
On April 11, 1988, at approximately 1 p.m., Arbelaez arrived in Miami. Martinez identified himself and assisted Arbelaez through customs. Upon exiting customs, Martinez arrested Arbelaez for the homicide of Julio Rivas and read him his Miranda rights in Spanish.[1] Martinez ascertained that Arbelaez had a sixth-grade education, understood his rights, was coherent and did not appear under the influence of narcotics or alcohol, and that he had not been threatened or promised anything for his return to the United States. Martinez asked Arbelaez if he had taken his medication for epilepsy that day and whether he felt any disorientation. Arbelaez indicated that he had taken the medication, but was not disoriented. Arbelaez also indicated that he wanted to make a statement and that he did not want an attorney present.
Martinez placed Arbelaez into the vehicle. During the car ride out of the airport, Arbelaez admitted to throwing the child off the bridge. Martinez asked Arbelaez to show him the exact location and Arbelaez agreed. Due to the timing of Arbelaez's arrival, he and Martinez stopped and got lunch at a local fastfood restaurant. After lunch, Arbelaez directed Martinez to the Rickenbacker Causeway, told him to make a U-turn on the high bridge and count four posts and then stop. Arbelaez stated that on the day of the murder he had stopped there, raised the hood in order to pretend that he was stranded, and then threw the child off the bridge. Martinez then drove Arbelaez to the police station.
At the police station, Arbelaez initialed a written Miranda warning form in Spanish that Martinez read to him before questioning him. Arbelaez indicated that he wanted to make a statement and that he did not need an attorney. Following the pre-interview, Arbelaez made an audio-taped sworn statement in which he acknowledged his Miranda rights. The audio-taped sworn statement was similar to his statements to Martinez in the pre-interview. After giving the audio-taped statement, Martinez asked Arbelaez if he would consent to giving a videotaped statement. Arbelaez consented and immediately recorded a videotaped statement in which he again acknowledged his Miranda rights and waived them. In both statements, Arbelaez indicated that he killed the child as a plan of revenge against Graciela. Arbelaez was then jailed.
At trial, the State introduced into evidence Arbelaez's audio-taped and videotaped statements given to the police as well as his statements to Pedro Salazar, Munoz, and Martinez. The State further presented testimony from Graciela about her relationship with Arbelaez in which she disputed Arbelaez's claim that they were going to get married. The State also entered the expert testimony of an oceanographer who stated the currents and weather conditions on February 14, 1988, would have carried a body, like the child's body, from the Powell Bridge to the area where the child's body was found.
Finally, the State entered the medical examiner's testimony about the injuries he observed on the child's body. The medical examiner testified that the child's neck had a *174 large bruise and a pinpoint hemorrhage in the left eye consistent with an attempted strangulation. Further, the child's lungs were not only hyperinflated and congested with blood, but the airways also had a considerable amount of frothy material, air mixed with fluid. The medical examiner concluded that the cause of death was asphyxia resulting from both strangulation and drowning. The medical examiner also testified that the child's body had a large bruise on the right leg and numerous bracket-shaped and rectangular-shaped bruises on the left side of the child's body. The child's face and forehead also had numerous linear abrasions consistent with it being knocked or pressed into something. Finally, the medical examiner testified that the bruises and abrasions were recent and occurred while the child was alive, but sometime near the time of death. Graciela testified that the child did not have these injuries on the morning of his death.
Arbelaez testified on his own behalf that he was thirty-three years old at the time of trial, that he was from Medellin, Colombia, and that he worked at a hotel as a dishwasher. He also testified that he was an epileptic and that he sometimes took medication for his condition. According to Arbelaez, he moved in with Graciela and her family and he provided her with financial support because he loved her and wanted to marry her. He testified in conformity with his statements given to the police that he had an argument with Graciela on February 13, 1988, because she kissed another man.
Arbelaez's testimony differed from his statements given to the police about the events on the date of the murder. He testified that he left Graciela's house on February 14, 1988, with the child and went to inform his boss at the hotel that he would not be working that day. He admitted to telling Londrian that Graciela would be sorry, but that he meant he would "beat" Graciela and her male friend if they were together again. He testified that after he left the cafeteria he started to go to work but he turned the car around and decided to return the child home. On the way back to the house, the car developed mechanical problems on the bridge and stopped. He got out of the car, raised the hood and "forgot" about the child. As he looked under the hood, he heard a scream and saw the child floating in the water. He stated that he fled because he thought, "Since I had the problem with her the previous night, they're going to think that I did it." Arbelaez testified that after he left the bridge he drove to Coral Gables and abandoned the car. He stated that before he abandoned the car he tore the dashboard of the car apart because he was "disgusted with it all."
On cross-examination, Arbelaez testified that Martinez "lied" and tricked him into confessing to the murder by promising him work in jail. Arbelaez also testified that Pedro Salazar and Munoz lied about his statements that he killed the child. After Arbelaez's testimony, the defense rested.
On February 19, 1991, the jury found Arbelaez guilty of kidnapping and the first-degree murder of Julio Rivas.
At the penalty phase of the trial, the State presented no additional witnesses and made argument based upon the evidence from the guilt phase of the trial. The defense first presented testimony by Martinez that Arbelaez had no significant history of prior criminal activity and that he returned to the United States voluntarily. The defense also presented the testimony of Arbelaez's friends, Juan Londrian, Pedro Salazar, Adelfa Salazar, and Marta Salazar. Londrian and the Salazars testified that Arbelaez was an honest and hard-working individual who never took narcotics or drank alcohol excessively. Finally, the defense presented the medical testimony of Dr. Raul Lopez, a neurologist who treated Arbelaez for an epileptic attack in 1984. Dr. Lopez testified that Arbelaez suffered from chronic epileptic seizures and that his previous anti-convulsion medication, Mysoline, had ceased to be effective. Dr. Lopez prescribed Depakote which he stated has the side effects of upset stomach, nausea, weight gain, and a mild shaking of the hands. Dr. Lopez lost contact with Arbelaez until 1986 when Arbelaez was admitted into the hospital again because of another convulsion. Tests run on Arbelaez indicated that he had not been taking his medication as instructed. Dr. Lopez specifically testified that the medication *175 that he had prescribed did not have the side effect of depression. Following Dr. Lopez's testimony, the defense rested.
The jury recommended a death sentence by a vote of eleven to one. The trial judge found the following aggravating circumstances: 1) the homicide was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification;[2] 2) the homicide was especially heinous, atrocious, or cruel;[3] and 3) the homicide was committed while the defendant was engaged in a kidnapping.[4] In mitigation, the trial court found that Arbelaez had no significant history of prior criminal activity[5] and the nonstatutory mitigating circumstance of remorse. The trial judge weighed the aggravating and mitigating circumstances and sentenced Arbelaez to death.
Arbelaez's first issue is whether the trial court erred in denying his motion to suppress statements elicited from him while he was in Medellin, Colombia, and later in Miami. Arbelaez argues that the statements he made to Martinez, Cadavid, and Munoz over the telephone should be suppressed because the police failed to give him a Miranda warning. Arbelaez urges that because the police focused the investigation on him as the only suspect, the police should have given him a Miranda warning before asking any questions over the telephone. Further, Arbelaez urges that the statements given to the police in Miami after his arrest should be suppressed as the result of these illegally obtained confessions.
We find Arbelaez's argument without merit. The United States Supreme Court established the Miranda warning as a procedural safeguard to protect an individual's Fifth Amendment privilege against compelled self-incrimination from the coercive pressures of a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Miranda warning does not apply "outside the context of the inherently coercive custodial interrogations for which it was designed." Roberts v. United States, 445 U.S. 552, 560, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980). The police are only required to give a Miranda warning when the individual is in custody. California v. Beheler, 463 U.S. 1121, 1124, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). In determining whether a suspect is in custody, "the ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Id. at 1125, 103 S.Ct. at 3520 (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). As this Court and the United States Supreme Court have previously recognized, "`the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood [the] situation.'" Roman v. State, 475 So.2d 1228, 1231 (Fla. 1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1986) (quoting Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)).
The facts in the instant case do not show that the police had Arbelaez in custody at the time he made his statements over the phone from Colombia. In fact, Arbelaez concedes in his reply brief that he was not in custody at the time he engaged in conversations with Martinez, Cadavid, and Munoz. Because the Miranda warnings are not required outside the context of custodial interrogation, we find Arbelaez's argument that the trial court erred in admitting his statements is without merit. Moreover, we find that the trial court properly admitted Arbelaez's confessions given to the police after his arrest upon his return to Miami. The record shows that the police read Arbelaez the Miranda warnings before each statement and that he voluntarily waived his constitutional rights. Thus, the trial court properly admitted Arbelaez's statements.
The next issue Arbelaez raises is whether the trial court erred in denying his motion for a mistrial following an emotional outburst by Graciela as she took the witness stand. Arbelaez argues that Graciela's emotional *176 outburst prejudiced the jury and that therefore his motion for mistrial should have been granted. The record shows that as Graciela took the witness stand she was crying during the administration of the oath. The prosecutor requested a break for the witness to collect herself and then moments later she called Arbelaez a "murderer" and a "son of a bitch" in Spanish. Defense counsel moved for a mistrial. The trial judge sent the jury to the jury room and warned the witness to answer only the attorney's questions and to compose herself. The trial judge then surveyed the bilingual jurors to determine if they understood Graciela's comments during the emotional outburst. After surveying the bilingual jurors, the trial judge called the entire jury panel back into the courtroom. The trial judge then gave a curative instruction to the jury to disregard the witness's emotional outburst. After giving the curative instruction, the trial judge further inquired whether each juror could disregard the witness's emotional outburst. The record shows that each juror individually responded in the affirmative.
We find that Arbelaez's argument that the trial court erred in not granting his motion for a mistrial is without merit. Because this Court cannot glean from the record how intense the witness's outburst was at the trial, we defer to trial judge's ruling that the outburst was not of such an intensity as to require a mistrial. Torres-Arboledo v. State, 524 So.2d 403 (Fla. 1988), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988); Justus v. State, 438 So.2d 358, 366 (Fla. 1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1332, 79 L.Ed.2d 726 (1984).
The next issue raised by Arbelaez is whether the trial judge properly found the aggravating circumstance that the murder was committed in a heinous, atrocious, or cruel manner. Arbelaez argues that the State failed to prove the heinous, atrocious, or cruel aggravating circumstance beyond a reasonable doubt. In the seminal case of State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), this Court addressed the meaning of "especially heinous, atrocious, or cruel":
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
Id. at 9. The record in the instant case supports the trial judge's finding of the heinous, atrocious, or cruel aggravating circumstances beyond a reasonable doubt. Both the medical examiner's testimony and Arbelaez's own statements show such additional acts as to set this murder apart from the norm of capital felonies.
The record shows that Arbelaez beat and strangled the child before throwing him off the Powell Bridge. At trial, Pedro Salazar testified that Arbelaez confessed to him shortly after killing the child. According to Pedro Salazar, Arbelaez stated that he shook the child and that "he squeezed the boy's neck." Pedro Salazar's testimony was corroborated by the medical examiner's testimony. The medical examiner testified that the child's injuries were consistent with strangulation. Further, the numerous bruises along the right and left sides of the child's body and the linear abrasions and rectangular bruises on the child's head and face show that the child was knocked or pressed into something. These injuries are consistent with the damage found inside Arbelaez's car. Moreover, the medical examiner found that the bruises to the child's body and choking on the neck were recent injuries that occurred while the child was alive, but shortly before death. The record shows that Arbelaez severely beat and choked the child before throwing him off the bridge. In addition to the bruises on the child's body, the record shows that the child was conscious at the time Arbelaez threw him off the bridge. Arbelaez's statements show that he called to the child and that the child lifted his arms up *177 to be picked up. Arbelaez reached down picked up the child and threw him off the bridge into the water seventy feet below. The medical examiner found the child's lungs were hyperinflated and filled with blood and frothy material which resulted from asphyxiation associated with both strangulation and drowning. We find that these facts show beyond a reasonable doubt the existence of the aggravating circumstance.
The next issue we address is whether the State proved beyond a reasonable doubt that the murder was committed in a cold, calculated, and premeditated manner without any moral or legal justification. Arbelaez argues that this aggravating circumstance is precluded because he killed the child in a rage after the child's mother had betrayed him. This Court uses the phrase "heightened premeditation" to distinguish the aggravating circumstance of cold, calculated, and premeditated from the premeditation element of first-degree murder. Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). The State must prove beyond a reasonable doubt that the defendant planned to kill or arranged to commit the murder before the crime began. Id. However, this aggravating circumstance does not apply when a murder occurs during a fit of rage because "rage is inconsistent with the premeditated intent to kill someone," unless there is other evidence to prove heightened premeditation beyond a reasonable doubt. Mitchell v. State, 527 So.2d 179, 182 (Fla.), cert. denied, 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988). The record in the instant case supports the trial judge's finding that the murder was committed in a cold, calculated, and premeditated manner. Arbelaez's statements given to the police surrounding the murder in conjunction with his actions show that the murder was part of a cold, calculated, and premeditated plan of revenge without pretense of moral or legal justification.
The record in the instant case shows that late in the evening on February 13, 1988, Arbelaez and Graciela had an argument. According to Arbelaez's statements, he felt wronged because Graciela had gone on a date with another man. Following the argument, Graciela went to her room while Arbelaez stayed in the living room. The next morning around 7:30 a.m., Arbelaez told the child to get into the car for a ride. Arbelaez's statements to the police show that at this point it was his intention to seek revenge against Graciela by drowning her son. Arbelaez drove his car to the Cafeteria Blanquita where he went inside for a cup of coffee. Both Juan Londrian, Arbelaez's friend, and Francisca Morgan, the waitress who served Arbelaez, stated that Arbelaez appeared calm and normal. Londrian also testified that Arbelaez told him "that bitch is going to remember me for the rest of her life." Although Arbelaez did not explain what he meant by the comment, his statements to the police show that he meant to drown the child. Finally, Arbelaez's statements to Munoz that "the best way to get back at Latin women is through the children" further shows that the murder was a careful premeditated plan of revenge. Moreover, Arbelaez's actions lend further support to the conclusion that the murder was a carefully calculated plan. Arbelaez's plan in lifting the hood of the car to pretend that his car was broken on the bridge while he threw the child off the bridge shows that he acted calmly and coldly in the murder. Finally, we agree with the trial judge that this murder is without a pretense of moral justification. Arbelaez murdered the child in order to strike at the child's mother. As the trial judge stated, "The victim was innocent of any wrongdoing, real or perceived." Thus, we find that the record shows beyond a reasonable doubt that the murder was cold, calculated, and premeditated without a pretense of moral or legal justification.
The next issue that Arbelaez raises is whether the trial court erred by failing to find the mitigating circumstances that he killed the child as the result of a mental or emotional disturbance and that he was unable to appreciate the criminality of his conduct. Arbelaez argues that the record shows that his rage in seeing Graciela with another man caused him to kill the child. We reject Arbelaez's argument and find no error in the trial court's failure to find these mitigating *178 circumstances applicable. A trial court has broad discretion in determining the applicability of mitigating circumstances. Daugherty v. State, 419 So.2d 1067, 1071 (Fla. 1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983). There was competent substantial evidence to support the trial court's rejection of these mitigating circumstances. See Stano v. State, 460 So.2d 890, 894 (Fla.), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). Moreover, the record shows that Arbelaez's epilepsy did not play a part in the murder. There is no evidence that Arbelaez suffered an epileptic attack immediately before or during the murder. Thus, we find that the trial court properly rejected the assertion that Arbelaez's epilepsy was a mitigating circumstance.
Finally, we address the proportionality of Arbelaez's death sentence. In Klokoc v. State, 589 So.2d 219 (Fla. 1991), this Court overturned a death sentence on proportionality grounds where the defendant killed his nineteen-year-old daughter as a means to retaliate against his estranged wife. In Klokoc this Court held that the trial court properly found the aggravating circumstance that the murder was cold, calculated, and premeditated; however, the Court also found that extensive mitigation existed and outweighed the one aggravating circumstance. In contrast, the record in the instant case shows three serious aggravating circumstances and scant mitigation. In reviewing the total record, we find that death is not a disproportionate penalty. See Adams v. State, 412 So.2d 850 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982) (death sentence upheld for murder of young child where the Court found the aggravating circumstances that the murder was heinous, atrocious, or cruel, was committed during the course of a felony, and was committed to avoid arrest and the three mitigating circumstances of no significant prior criminal history, defendant acted under extreme mental or emotional disturbance, and the defendant's age); see also Mann v. State, 603 So.2d 1141 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1993) (death sentence upheld for murder of young child where the Court found the aggravating circumstances of prior violent felony, murder during the commission of a felony, and the murder was heinous, atrocious, or cruel and the several nonstatutory mitigating circumstances including remorse).
Accordingly, we affirm Arbelaez's convictions for first-degree murder and kidnapping and his death sentence.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] § 921.141(5)(i), Fla. Stat. (1989).
[3] § 921.141(5)(h), Fla. Stat. (1989).
[4] § 921.141(5)(d), Fla. Stat. (1989).
[5] § 921.141(6)(a), Fla. Stat. (1989).