[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14647

_____

D.C. Docket No. 1:12-cv-23304-FAM

GUILLERMO O. ARBELAEZ,

Petitioner - Appellant,

versus

FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 12, 2016)

Before HULL, MARCUS and JILL PRYOR, Circuit Judges.

PER CURIAM:

In this capital case, Guillermo Arbelaez appeals the district court's denial of

his federal habeas petition.  Arbelaez was sentenced to death in Florida for the

murder of his former girlfriend's five year old son, which he carried out to exact revenge against her after an argument.  Following an unsuccessful direct appeal and collateral proceedings in the Florida state courts, Arbelaez filed a federal habeas petition in the United States District Court for the Southern District of Florida, which the district court denied.  Arbelaez appeals the rejection of his petition on two grounds.  First, he contends that his trial counsel was constitutionally ineffective in investigating and presenting to the jury a case in mitigation of the death penalty.  Second, he contends the Florida courts' determination that he was not intellectually disabled (and therefore ineligible for the death penalty) constituted an unreasonable application of clearly established law and was based on an unreasonable determination of the facts presented at an evidentiary hearing.

After a thorough review of the briefing and the record, and with the benefit of oral argument, we affirm the denial of Arbelaez's petition.[1]  With regard to the ineffective assistance claim, we conclude that Arbelaez has failed to demonstrate that his counsel's performance prejudiced his penalty phase proceedings.  As regards his intellectual disability claim, we conclude he has failed to demonstrate that the Florida Supreme Court unreasonably applied the law or made unreasonable

---

[1] Arbelaez's motion to stay further appellate proceedings is DENIED.  All other pending motions are DENIED AS MOOT.

determinations of fact when it concluded that he lacked concurrent deficits in adaptive behavior.

## I.    FACTUAL BACKGROUND

Arbelaez was convicted in Florida of kidnapping and first degree murder.  A jury voted 11 to 1 to recommend a death sentence, and the trial court accepted the recommendation.  Below we recount the events that led to Arbelaez's conviction and sentence, as well as evidence adduced at his state postconviction proceedings.

### A. Facts Elicited at Trial

Shortly after Arbelaez met Graciela Alfara, the victim Julio Rivas's mother, he moved in with her and her family (five year old Julio, two teenaged daughters, and a nineteen year old cousin), and the two became intimate.  *See Arbelaez v. State* ("*Arbelaez I*"), 626 So. 2d 169, 170 (Fla. 1993).  The relationship ended soon after it began, however, when Alfara accused Arbelaez of touching one of her daughters inappropriately.  *Id.*  Shortly after the breakup, Arbelaez saw Alfara kiss another man.  *Id.*  When he confronted her, Alfara told Arbelaez that she did not love him and he should move out.  *Id.*

The next morning, while Alfara was still asleep, Arbelaez took Julio from the home.  *Id.* at 171.  Arbelaez drove to a restaurant for coffee.  *Id.*  Leaving Julio in the car, Arbelaez went inside, where he spoke to his friend Juan Londrian about

his fight with Alfara. *Id.* Londrian testified at trial that Arbelaez told him "that he was going to do something that would assure 'that bitch is going to remember me for the rest of her life.'" *Id.* Arbelaez left the restaurant and, after driving around with Julio in the car for a couple of hours, attempted to call Alfara. *Id.* When Alfara refused to speak with him, he "drove to the crest of the Powell Bridge on the Rickenbacker Causeway and stopped, exited his car, and lifted the hood, pretending that his car had broken down." *Id.* There, he threw Julio off the bridge into the water 70 feet below. *Id.*

According to evidence introduced at trial, Julio was beaten and strangled before he was thrown off the bridge. *Id.* at 173-74. A medical examiner testified that the cause of death was asphyxia resulting from both strangulation and drowning and that the boy's body "had a large bruise on the right leg" and "numerous bracket-shaped and rectangular-shaped bruises on the left side" of the body. *Id.* at 174. "The child's face and forehead also had numerous linear abrasions consistent with it being knocked or pressed into something." *Id.* The jury saw photographs of Julio's body which depicted his injuries. When police located Arbelaez's car, they observed damage to the dashboard "consistent with something coming into contact with the panel." *Id.* at 171.

The jury heard that Arbelaez confessed to the crime five times. Immediately after the murder, Arbelaez confessed to a friend, Pedro Salazar. He told Salazar

"that he 'shook' the child and 'squeezed the boy's neck.'" *Id.* He also told Salazar that he threw Julio off the bridge because he wanted revenge against Alfara. *Id.* Arbelaez fled to Colombia, and while there he spoke with Federal Bureau of Investigation Detective Rubin Munoz. *Id.* at 172. Arbelaez gave his second confession to Munoz, telling the detective that he had killed Julio and explaining: "'As a Latin you would understand the best way to get to a woman is through her children.'" *Id.*

When Arbelaez returned voluntarily to the United States two months after the murder, Homicide Detective Eddy Martinez arrested him at the airport. *Id.* at 173. While in custody, Arbelaez confessed three more times to Julio's murder. In his third confession, "Arbelaez stated that on the day of the murder he had stopped [on the bridge], raised the hood in order to pretend that he was stranded, and then threw the child off the bridge." *Id.* The fourth confession, which was audiotaped, was similar in content. The fifth, also similar in content, was videotaped. In each taped interview, "Arbelaez indicated that he killed the child as a plan of revenge against [Alfara]." *Id.*

Despite these confessions, Arbelaez testified on his own behalf at trial, where he denied committing the murder. Although he admitted taking Julio from Alfara's house, he said that he had car trouble on the bridge, forgot about Julio when he went to look under his hood, heard a scream, and then saw Julio floating

in the water below. *Id.* at 174. Arbelaez testified that he tore his car's dashboard apart because he was "disgusted with it all." *Id.* When confronted with his prior confessions, Arbelaez claimed that Salazar, Munoz, and Martinez were lying. *Id.*

The jury found Arbelaez guilty of kidnapping and first degree murder. *Id.*

## B. Sentencing Proceedings

At the sentencing phase, the State called no witnesses to testify. Defense counsel presented six witnesses in mitigation. Detective Martinez testified that, to his knowledge, Arbelaez had no significant criminal history and returned voluntarily to the United States after he had fled to Colombia. *Id.* Four other witnesses—Londrian, Pedro Salazar, Adelfa Salazar, and Marta Salazar—testified about their relationship with Arbelaez. Each testified that Arbelaez was an honest, hard-working individual who never took narcotics or drank excessively. *Id.* A sixth witness, neurologist Dr. Raul Lopez, testified that he treated Arbelaez for "chronic epileptic seizures" a few years before the murder. *Id.* at 174-75.

The jury recommended a death sentence by a vote of 11 to 1. *Id.* at 175. The trial judge found three aggravating circumstances: the homicide was (1) committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification ("CCP"); (2) especially heinous, atrocious, or cruel ("HAC"); and (3) committed while Arbelaez was engaged in a kidnapping. Fla. Stat. § 921.141(5)(d), (h), (i) (1989). The judge found one statutory mitigating

6

circumstance: Arbelaez had no significant history of prior criminal history. *Id.* § 921.141(6)(a). And the judge found one nonstatutory mitigating circumstance: Arbelaez demonstrated remorse. After weighing these factors, the judge adopted the jury's recommendation and imposed a death sentence.

## C. Direct Appeal and State Postconviction Proceedings

The Florida Supreme Court affirmed Arbelaez's convictions and sentence on direct appeal. *Arbelaez I*, 626 So. 2d 169, *cert. denied*, 114 S. Ct. 2123 (1994). Arbelaez then initiated state postconviction proceedings. His first proceeding concerned his claim that counsel rendered ineffective assistance in failing to investigate and present an adequate case in mitigation of the death penalty. After the Supreme Court held in *Atkins v. Virginia*, 536 U.S. 304 (2002), that the Eighth Amendment prohibits the execution of intellectually disabled persons, Arbelaez initiated another state proceeding alleging that he was intellectually disabled.

### 1. Ineffective Assistance Postconviction Motion

The trial court conducted an evidentiary hearing[2] on Arbelaez's ineffective assistance claim at which postconviction counsel elicited testimony from several

---

[2] This evidentiary hearing came after the trial court initially summarily denied relief and the Florida Supreme Court remanded. *See Arbelaez v. State*, 775 So. 2d 909 (Fla. 2000).

witnesses, including trial counsel Reemberto Diaz,[3] clinical and forensic

psychologist Dr. Merry Haber, neuropsychologist and behavioral epileptologist Dr.

Ruth Latterner, and two of Arbelaez's sisters.

Arbelaez's sisters testified about Arbelaez's troubled childhood in

Colombia.  Both testified that Arbelaez suffered severe physical abuse at the hands

of their father and, to a lesser extent, their mother, brother, and at least one teacher.

They recounted that their family was poor and the children often went hungry.

Arbelaez's sisters further testified that Arbelaez was a slow learner at school,

endured epileptic episodes without medical treatment, experienced depression (and

abused marijuana to cope), attempted suicide several times, and spent time in a

mental hospital.

Postconviction counsel's experts testified about Arbelaez's mental health

and intellectual functioning.  Dr. Haber testified that, when she screened Arbelaez

prior to trial at counsel's behest, she believed Arbelaez to be of borderline

intelligence.  She suspected that, based on Arbelaez's epilepsy, he likely has

organic brain impairment.[4]  She testified that Arbelaez showed signs of a

---

[3] Because we assume for purposes of analyzing this claim under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), that trial counsel performed deficiently, we do not recount Diaz's testimony.

[4] Postconviction counsel introduced Dr. Haber's testimony in large part to demonstrate that trial counsel was deficient in failing to investigate red flags about Arbelaez's mental health and family history.  We do not recount her testimony relevant to deficient performance because of our assumption for purposes of this opinion that counsel's performance was deficient under

depressive disorder and previously had undergone electroshock therapy in Colombia while hospitalized after a suicide attempt. Dr. Latterner, who evaluated Arbelaez in preparation for the evidentiary hearing, testified that Arbelaez is intellectually disabled and suffers from epilepsy and organic brain damage. The State called clinical psychologist Dr. Sonia Ruiz, who testified that she did not believe Arbelaez is intellectually disabled or suffers from organic brain impairment.

The trial court rejected Arbelaez's ineffective assistance claim, and the Florida Supreme Court affirmed. *See Arbelaez v. State*, 898 So. 2d 25, 41 (Fla. 2005). The Florida Supreme Court divided Arbelaez's ineffective assistance claim into subclaims—failure to investigate and present evidence of (1) epilepsy, (2) other mental health mitigation, and (3) family history—and then analyzed deficient performance and prejudice individually for each one. With respect to epilepsy, the Florida Supreme Court concluded that Arbelaez failed to show counsel performed deficiently or that any deficiency prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (explaining that, to establish ineffective assistance of counsel, the defendant "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense"). As to other mental health

---

*Strickland*. To be clear, we do not decide whether trial counsel was deficient but only assume it for purposes of this opinion.

9

mitigation, the court concluded that, although counsel's performance was deficient, Arbelaez could not demonstrate prejudice. With respect to family history, the Florida Supreme Court held that counsel's performance was not deficient. The court did not address prejudice as it pertained to this subclaim.[5]

### 2. *Intellectual Disability Postconviction Motion*

In a separate proceeding, the trial court conducted an evidentiary hearing on Arbelaez's claim that he is intellectually disabled and therefore ineligible for the death penalty.[6] Specifically, the court conducted the hearing to determine whether Arbelaez satisfied Florida's definition of intellectual disability, that is, "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." Fla. R. Crim. P. 3.203; *see Atkins*, 536 U.S. at 317 ("[W]e leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." (alterations and internal quotation marks omitted)).

As relevant to this appeal, postconviction counsel proffered testimony from psychologist Dr. Ricardo Weinstein and educational psychologist Dr. Thomas

---

[5] After the Florida Supreme Court denied relief, Arbelaez did not petition the Supreme Court of the United States for a writ of certiorari.

[6] As with his ineffective assistance of counsel hearing, Arbelaez's intellectual disability hearing also came after the trial court summarily denied this claim and the Florida Supreme Court remanded for a hearing. *See Arbelaez v. State*, 950 So. 2d 413 (Fla. 2006).

Oakland to support the claim that Arbelaez is intellectually disabled.[7]  The State

presented the testimony of psychologist Dr. Enrique Suarez.  Court appointed

expert Dr. Sonia Ruiz, a forensic psychologist (who had testified at Arbelaez's

ineffective assistance evidentiary hearing), also testified.  Both Dr. Suarez and Dr.

Ruiz testified Arbelaez was not intellectually disabled, and thus their conclusions

about Arbelaez's intellectual functioning contradicted the opinions of Arbelaez's

experts.After evaluating Arbelaez, Dr. Weinstein opined that he was intellectually

disabled.  Dr. Weinstein obtained an intellectual quotient ("IQ") score of 65, which

he testified qualified as significantly subaverage general intellectual functioning.

As to deficits in adaptive behavior, Dr. Weinstein testified that he did not formally

assess Arbelaez's deficits concurrent with the IQ evaluation, although he generally

observed some deficits during the evaluation.

According to Dr. Weinstein, people with intellectual disabilities are poor

self-reporters of their own adaptive functioning, so it is best to obtain this

information from the individual's community.  Dr. Weinstein opined that, due to

its restrictive environment, a prison cannot constitute a community and prison

guards would be inappropriate subjects for his interviews.  Dr. Oakland agreed

with Dr. Weinstein that prison was an inappropriate setting for assessing adaptive

---

[7] Arbelaez's counsel also called several laywitnesses, including friends and family who knew Arbelaez in Colombia or Florida and three corrections officers who had observed Arbelaez in prison.  Their testimony is immaterial to the issues we address here.

deficits, testifying that "[i]t is not possible to assess adaptive behavior within the setting similar to death row." So instead, Dr. Weinstein reached his conclusion that Arbelaez suffered from concurrent deficits in adaptive behavior based on interviews with family members, priests, a teacher, and several friends, as well as a review of school, medical, and prison records. He also obtained measures of Arbelaez's adaptive functioning by asking Arbelaez's mother and a schoolteacher to complete the Adaptive Behavior Assessment Scales ("ABAS"), a test used to evaluate an individual via members of his community. Based on interviews, the ABAS results, and his observations, Dr. Weinstein concluded that Arbelaez had concurrent deficits in adaptive functioning. Relying on his interviews with people who knew Arbelaez as a child, Dr. Weinstein concluded that Arbelaez had significantly subaverage general intellectual functioning and adaptive behavioral deficits prior to age 18.

Dr. Weinstein's opinion was rejected by the State's expert, Dr. Suarez, and by the court-appointed expert, Dr. Ruiz. Dr. Suarez evaluated Arbelaez and, considering information from before and during his incarceration, including formal tests of concurrent adaptive functioning, opined that he was not intellectually disabled. He based his opinion on the facts that Arbelaez: needed no support to function in his daily life (he was able to drive and run errands and he communicated with others, even in English); came to this country with relatively

12

little assistance; secured employment and performed adequately; used an alias at work; and fled the country after his crime. Dr. Suarez administered a series of tests and opined from the results that Arbelaez's reasoning level was probably in the average range.

Dr. Ruiz testified about her evaluation of Arbelaez during preparation for the ineffective assistance of counsel evidentiary hearing. She testified that she did not believe Arbelaez was intellectually disabled, but conceded that she relied primarily on Arbelaez's self-reporting. After interviewing Arbelaez, Dr. Ruiz concluded Arbelaez was not intellectually disabled because he reported that he had traveled alone to Venezuela, the Bahamas, Panama, and Jamaica before coming to the United States and had held and performed a variety of jobs before being incarcerated. Dr. Ruiz administered a number of tests and reviewed other reports and records on Arbelaez. She concluded from her evaluation that Arbelaez had a borderline intelligence level, no intellectual disability, and abilities to communicate and live independently that were inconsistent with intellectual disability.

The trial court denied relief, concluding that Arbelaez failed to demonstrate significantly subaverage intellectual functioning or concurrent adaptive deficits. The Florida Supreme Court affirmed, holding that "Arbelaez did not prove that he has concurrent deficits in adaptive behavior as required by" Florida law. *Arbelaez*

*v. State*, 72 So. 3d 745, 745 (Fla. 2011), *cert. denied sub nom.*, *Arbelaez v. Florida*, 132 S. Ct. 1950 (2012).

## D. Federal Habeas Proceeding

After he had exhausted his state appeals, Arbelaez filed a petition for a writ of habeas corpus in federal district court, raising several claims including his ineffective assistance and intellectual disability claims. The district court denied Arbelaez relief but granted him a certificate of appealability ("COA") on his claim that counsel rendered ineffective assistance at the penalty phase of his trial. We expanded Arbelaez's COA to include his claim that the Florida Supreme Court's intellectual disability determination constituted an unreasonable application of clearly established federal law and was based on an unreasonable determination of facts in light of the evidence presented at the evidentiary hearing.

## II.    STANDARD OF REVIEW

"When reviewing a district court's grant or denial of habeas relief, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 899 (11th Cir. 2013) (internal quotation marks omitted).

The standard by which we and the district court must review the relevant state court decisions depends on whether the state court rendered a decision on the merits of Arbelaez's claims. If so, then we review those claims under the

standards set by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"). *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). Generally,

AEDPA bars federal courts from granting habeas relief to a petitioner on a claim

that was adjudicated on the merits in state court unless the state court's

adjudication:

> (1) resulted in a decision that was contrary to, or involved an
>     unreasonable application of, clearly established Federal law,
>     as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
>     determination of the facts in light of the evidence presented
>     in the State court proceeding.

28 U.S.C. § 2254(d). "'[C]learly established Federal law' under § 2254(d)(1) is

the governing legal principle or principles set forth by the Supreme Court at the

time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72

(2003). With respect to § 2254(d)(2), "[s]tate court fact-findings are entitled to a

presumption of correctness unless the petitioner rebuts that presumption by clear

and convincing evidence." *Conner v. GDCP Warden*, 784 F.3d 752, 761 (11th Cir.

2015).

If the state courts have not rendered a decision on the merits of a claim, then

our review is *de novo*. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because

the state court did not decide whether Porter's counsel was deficient, we review

this element of Porter's *Strickland* claim *de novo*.").

15

For the reasons that follow, we review Arbelaez's ineffective assistance of counsel claim *de novo* and his intellectual disability claim through AEDPA's deferential lens.

### III.    DISCUSSION

**A. Ineffective Assistance of Counsel Claim**

Arbelaez claims that his trial counsel was ineffective in failing to investigate and present evidence about his mental health problems and troubled family history during the penalty phase and that there is a reasonable probability that, had the jury heard that evidence, it would have recommended a sentence other than death. Under *Strickland*, 466 U.S. at 686, a defendant has a Sixth Amendment right to effective assistance of trial counsel. Counsel renders ineffective assistance, warranting vacatur of a conviction or sentence, when his performance falls "below an objective standard of reasonableness," taking into account prevailing professional norms, and when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

We assume for present purposes that Arbelaez's trial counsel rendered deficient performance in failing to investigate and present a sufficient case in mitigation. *See Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1283-84 (11th Cir.

16

2013) (making "simplifying assumptions in favor of the petitioner" to facilitate the Court's analysis, including assuming deficient performance and deciding *Strickland*'s prejudice prong only). Thus, we must decide whether counsel's deficient performance prejudiced Arbelaez in the penalty phase of his trial, considering in addition to the testimony counsel actually elicited at the penalty phase the mental health and family history mitigating evidence adduced at the postconviction evidentiary hearing.

Although the Florida Supreme Court decided on the merits the prejudice prong of one subclaim—failure to investigate and present mental health mitigation evidence—it failed to assess prejudice as it pertained to counsel's failure to investigate and present evidence of Arbelaez's family background. We thus are left with a situation in which part of our prejudice inquiry may require deference to the Florida Supreme Court's decision, while part may not. We need not resolve how to apply AEDPA deference to the Florida Supreme Court's decision, however, because even under *de novo* review Arbelaez cannot demonstrate that counsel's failure to investigate and present this mitigating evidence prejudiced his defense. *See id.* Moreover, we consider as one claim rather than as independent subclaims Arbelaez's contention that counsel failed to investigate and present adequate evidence in mitigation; this evidence is inherently interrelated. *See Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003) (considering mitigating evidence of

17

petitioner's "diminished mental capacities" together with his "troubled history" in deciding whether counsel's deficient performance prejudiced his defense).

We conclude that Arbelaez suffered no prejudice from his counsel's failure to present mitigation testimony from his sisters and mental health experts. Arbelaez's sisters testified that he suffered from an extremely physically abusive and impoverished childhood. They and Arbelaez's mental health experts testified that Arbelaez had epilepsy with organic brain damage, was depressed, had attempted suicide, and had low intellectual functioning. All of these circumstances indisputably are mitigating. *See id.* Nevertheless, when we consider this new mitigating evidence together with the mitigation evidence actually presented at trial—that Arbelaez was hard working and lacked any significant criminal history—and weigh it against the evidence in aggravation, we cannot conclude that Arbelaez has met *Strickland*'s standard for prejudice.[8]

"This is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." *Sochor v. Sec'y, Dep't of Corr.*, 685 F.3d 1016, 1030 (11th Cir. 2012) (internal quotation marks omitted). After the jury recommended a death sentence, the trial judge found that the prosecution proved three statutory aggravators, including CCP and HAC. The Florida Supreme Court

---

[8] The trial judge also concluded that Arbelaez demonstrated remorse but, in light of Arbelaez's denial of any involvement of the crime at trial, understandably assigned that mitigating factor little weight.

18

"has consistently recognized that CCP and HAC are two of the weightiest aggravators in Florida's statutory sentencing scheme." *Brown v. State*, 143 So. 3d 392, 405 (Fla. 2014). The evidence postconviction counsel introduced would not have reduced the impact of these powerful aggravators sufficient to undermine our confidence in the outcome of Arbelaez's penalty phase proceedings.

The new mitigating evidence would not have mitigated the strength of the HAC aggravator, which "'pertains more to the nature of the killing and the surrounding circumstances'" than the defendant's mental state. *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 561 (11th Cir. 2015) (quoting *Stano v. State*, 460 So. 2d 890, 893 (Fla. 1984)). Evidence introduced at trial demonstrated that five year old Julio was kidnapped, driven around for several hours, beaten, strangled, and thrown 70 feet into the water, where he drowned. The jury saw photographs that demonstrated the extent of Julio's injuries, including photographs of his body and the damaged dashboard of Arbelaez's car.

Similarly, the mitigating evidence regarding Arbelaez's mental health and troubled childhood is insufficient to undermine substantially the strength of the evidence supporting the CCP aggravator in this case. The jury heard that Arbelaez told a friend before the murder that he was going to "assure 'that bitch is going to remember me for the rest of her life,'" referring to Alfara. *Arbelaez I*, 626 So. 2d at 171. The jury heard about not one, not two, but *five* confessions Arbelaez gave,

19

including two confessions in Arbelaez's own recorded voice. These confessions likely were extraordinarily powerful evidence in aggravation. Remarkably consistent in their chilling details—Arbelaez repeatedly explained that he murdered Julio to exact revenge upon the child's mother—these confessions provided the jury with a concrete basis on which to conclude that the murder was cold, calculated, and premeditated.

In sum, evidence of Arbelaez's mental health and troubled family background undoubtedly would have been mitigating. Even so, in light of the highly aggravated nature of the crime at issue in this case, we conclude that there is no reasonable probability that the evidence would have convinced the jury to recommend a sentence other than death. *See Crawford v. Head*, 311 F.3d 1288, 1322 (11th Cir. 2002) (concluding upon a *de novo* review that evidence of a defendant's alcoholic father and disadvantaged childhood, although mitigating, would not overcome an "extremely aggravated" murder). Accordingly, we affirm the denial of relief on Arbelaez's ineffective assistance of counsel claim.

## B. Intellectual Disability Claim

The Eighth Amendment to the United States Constitution prohibits the execution of the intellectually disabled. *Atkins*, 536 U.S. at 321. Consistent with *Atkins*, we look to Florida law for the applicable definition of intellectual disability. *See Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009). Florida

law defines intellectual disability as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." Fla. R. Crim. P. 3.203. "[S]ignificantly subaverage general intellectual functioning" means "performance that is two or more standard deviations from the mean score on a standardized intelligence test." *Id.* We assume for purposes of this opinion that Arbelaez meets this requirement, *see Castillo*, 722 F.3d at 1283-84, and consider the adaptive behavior deficiency prong.

"[A]daptive behavior" means "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." Fla. R. Crim. P. 3.203. The American Association of Intellectual and Developmental Disabilities' ("AAIDD") definition of intellectual disability, with which Florida's definition is consistent, defines adaptive deficits as "'limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.'" *Atkins*, 536 U.S. at 308 n.3 (quoting AAIDD definition in effect in 2002).[9]

_____

[9] Defense expert Dr. Marc Tasse conceded that Florida's definition of intellectual disability, including a requirement of concurrent adaptive deficits, was consistent with the

21

The Florida Supreme Court denied on the merits Arbelaez's intellectual disability claim, so we review it under AEDPA's deferential standard of review. Arbelaez contends that the Florida Supreme Court's decision is not entitled to deference because it was based on an unreasonable application of clearly established federal law, § 2254(d)(1), and an unreasonable determination of the facts, § 2254(d)(2).  We disagree.

1. *Florida Supreme Court's Application of Clearly Established Federal Law*

Arbelaez contends that Florida's requirement that a petitioner demonstrate concurrent deficits in adaptive behavior contravenes *Atkins* and the Supreme Court's later decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014).[10]  He argues that these cases, taken together, require states to conform their definitions of intellectual disability to accepted medical and professional standards.  And,

---

definitions used by the AAIDD and the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition.  "Earlier publications of the AAIDD [such as the one quoted in *Atkins*] were published under its former name, the American Association on Mental Retardation."  *Hall v. Florida*, 134 S. Ct. 1986, 2003 n.1 (2014).

[10] In *Hall*, the Supreme Court held that Florida's rigid rule foreclosing "all further exploration of intellectual disability" if a petitioner is deemed to have an IQ above 70 was unconstitutional.  134 S. Ct. at 1990.  But *Hall* was decided after the Florida Supreme Court rendered its decision on Arbelaez's intellectual disability postconviction motion, so it was not a "governing legal principle" at that time.  *Andrade*, 538 U.S. at 71-72.  We conclude, however, that the Florida Supreme Court's decision withstands our deferential review even if *Hall* applied retroactively.  *See Castillo*, 722 F.3d at 1283-84.

Arbelaez asserts, medical and professional standards dictate that adaptive deficits cannot be determined adequately in a prison environment.

We acknowledge Arbelaez's concern about the difficulties attendant in assessing deficits in adaptive behavior in a restrictive carceral environment. *See Hall v. State*, No. SC10-1335, __ So. 3d __, 2016 WL 4697766, at *7 (Fla. Sept. 8, 2016) ("Evaluating the adaptive behavior of an individual who has spent much of his adult life incarcerated can be difficult."). But the question before us is not whether we would render a different decision on Arbelaez's claim than the Florida Supreme Court. *Andrade*, 538 U.S. at 75. Rather, to overcome AEDPA's deferential standard of review, Arbelaez "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Arbelaez cannot make this showing. Nothing in the holdings of *Atkins* or *Hall* speaks directly to the methodology for discerning an individual's deficits in adaptive functioning. *See Williams*, 529 U.S. at 412 (emphasizing that the phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta," of the Supreme Court's decisions). The Florida Supreme Court's determination that United States Supreme Court precedent is consistent with Florida's requirement that a petitioner

23

show concurrent deficits in adaptive functioning is not, therefore, beyond any fairminded disagreement.

*2. Florida Supreme Court's Determination of Facts*

Arbelaez also contends that the Florida Supreme Court's decision that he is not intellectually disabled rests on an unreasonable factual determination. Again, we assume for our purposes that Arbelaez has satisfied the required showing of significantly subaverage intellectual functioning, so we do not address the trial court's denial on that ground. With respect to its findings on adaptive functioning, Arbelaez argues that the Florida Supreme Court's decision was premised on three flawed factual determinations. He asserts that the decision: (1) ignored that Dr. Weinstein informally observed deficits in Arbelaez's adaptive behavior during his evaluation, (2) disregarded much or all of Dr. Weinstein's findings regarding Arbelaez's adaptive functioning leading up to his incarceration, and (3) unreasonably rejected Dr. Weinstein's use of the ABAS as a retrospective measure of adaptive functioning.

"A determination as to whether a person is [intellectually disabled] is a finding of fact." *Fults v. GDCP Warden*, 764 F.3d 1311, 1319 (11th Cir. 2014). We may only disturb a state court's factual findings if they are unreasonable. "The term 'unreasonable' is no doubt difficult to define." *Williams*, 529 U.S. at 410. Nonetheless, "it is enough to reiterate that a state-court factual determination is not

unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (internal quotation marks omitted). Thus, "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Wood v. Allen*, 558 U.S. 290, 302 (2010) (alterations and internal quotation marks omitted).

Arbelaez cannot demonstrate that the Florida Supreme Court's conclusion that he lacks deficits in adaptive behavior was based on an unreasonable determination of the facts introduced at the evidentiary hearing. Under Florida law, a person is intellectually disabled only if he has deficits in adaptive behavior existing concurrently with significantly subaverage general intellectual functioning. Although Dr. Weinstein made observations of Arbelaez's adaptive behavior during the in-prison evaluation, he conceded that he failed to use any formal measure to assess Arbelaez's adaptive functioning concurrent with the IQ testing. By contrast, Dr. Suarez assessed Arbelaez's adaptive behavior both retrospectively and concurrently with intellectual functioning testing, concluding that Arbelaez lacked the requisite adaptive behavioral deficits. Because the basis for Dr. Suarez's opinion more closely tracked Florida's definition of intellectual disability, the Florida Supreme Court was entitled to credit Dr. Suarez's opinion over Dr. Weinstein's.

Given that it was reasonable to credit Dr. Suarez's opinion over Dr. Weinstein's based on Dr. Weinstein's failure to formally assess concurrent adaptive deficits, Arbelaez's other two points of dispute with the factual findings regarding his intellectual disability claim also must fail. Those arguments pertain to the soundness of Dr. Weinstein's *retrospective* study of adaptive functioning, which the Florida Supreme Court reasonably decided was insufficient for a reliable opinion on *concurrent* deficits in adaptive behavior. Thus, as the district court concluded, "even if Arbelaez had proved [through Dr. Weinstein's evaluation] that he had adaptive deficits while growing up in Colombia and during the time he lived in Florida," "he has not shown that the Florida Supreme Court's determination that he failed to prove *concurrent* adaptive deficits at the time of the intellectual quotient testing was an unreasonable determination of facts." *Arbelaez v. Crews*, 43 F. Supp. 3d 1271, 1297 (S.D. Fla. 2014).

Because Arbelaez was unable to pierce AEDPA deference, we are required to defer to the Florida Supreme Court's determination that he is not intellectually disabled. Accordingly, we affirm the denial of relief on Arbelaez's intellectual disability claim.

## IV.    CONCLUSION

The district court's denial of Arbelaez's petition for a writ of habeas corpus is affirmed.

26

**AFFIRMED.**