[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11779

_____

D.C. Docket No. 1:17-cv-00061-KD-MU

MATTHEW REEVES,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA
DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(November 10, 2020)

Before WILSON, MARTIN, and JORDAN, Circuit Judges.

PER CURIAM:

Matthew Reeves, an Alabama prisoner on death row, appeals the district court's denial of his habeas corpus petition. *See* 28 U.S.C. § 2254. He argues that habeas relief should have been granted on two grounds. First, he asserts that he is intellectually disabled and therefore ineligible for the death penalty. Second, he

contends that his trial counsel rendered ineffective assistance by failing to hire an expert to evaluate him for intellectual disability—despite petitioning for and obtaining funds to do so.

For the reasons which follow, we affirm in part and reverse in part. We affirm the denial of habeas relief on the intellectual disability claim, but we reverse the denial of habeas relief on the ineffective assistance of counsel claim.

**I**

In January of 1998, an Alabama jury found Mr. Reeves guilty of capital murder. By a 10-2 vote, the jury recommended that Mr. Reeves be sentenced to death, and the trial court followed that recommendation. We recount the events that led to Mr. Reeves' conviction and sentence, as well as evidence adduced at the state post-conviction proceedings.

**A**

The facts underlying Mr. Reeves' conviction were described by the Alabama Court of Criminal Appeals on direct appeal. *See Reeves v. State*, 807 So. 2d 18 (Ala. Crim. App. 2000). We summarize them as follows.

On November 27, 1996, Mr. Reeves, who was 18 years old at the time, his brother Julius, and several other individuals set out to commit a robbery. *See id.* at 24. Their car, however, broke down. A passing driver, Willie Johnson, stopped in his pickup truck and offered to tow the car. *See id.*

After Mr. Johnson towed the car, Julius offered to give him a ring as payment if he would drive the group to his girlfriend's house to get it. *See id.* Mr. Johnson agreed, not knowing that Julius had told the others that Mr. Johnson was going to be their robbery victim. *See id.* After taking the group to pick up the ring, Mr. Johnson drove them back to the Reeves' house. *See id.* at 24–25. As the truck came to a stop, Mr. Reeves shot and killed Mr. Johnson and instructed the others to go through his pockets to "get his money." *See id.* at 25.

## B

Two attorneys, Blanchard McLeod and Marvin Wiggins, were initially appointed to represent Mr. Reeves. Before trial, Mr. McLeod and Mr. Wiggins petitioned the trial court for funds to hire a clinical neuropsychologist, Dr. John R. Goff, to evaluate Mr. Reeves for intellectual disability. After the trial court denied the motion, Mr. McLeod and Mr. Wiggins sought rehearing. In their rehearing request, they said they "possesse[d] hundreds of pages of psychological, psychometric and behavioral analysis material relating to" Mr. Reeves. *See* D.E. 23-1 at 74. They also asserted "[t]hat a clinical neuropsychologist or a person of like standing and expertise *is the only avenue* open to the defense to compile this information, correlate this information, interview the client and present this

3

information in an orderly and informative fashion to the jury during the mitigation phase[.]" *Id*. at 74–75 (emphasis added).[1]

During a subsequent hearing before the trial court, Mr. McLeod further explained why retaining a neuropsychologist was critical:

> This is a mitigation expert who we would expect because of the tremendous amount of discovery material provided to us from the Department of Youth Services, from the schools, . . . and all of the psychologicals and all that we do have available that we are going to need someone to assist us in the mitigation phase of this case. . . . This is not for competency. This is for the mitigation phase of the case, and it's going to be a little late once we finish the guilt phase of the case to worry about retaining someone to assist with the preparation of the mitigation phase.

D.E. 23-3 at 92–93. Mr. McLeod continued: "We have received two to three hundred pages of discovery material in the nature of a psychological and a psychiatric information that is going to be exceptionally pertinent at the penalty phase of this proceeding." *Id.* at 96.

On October 16, 1997, the trial court granted the defense's request for funding to hire Dr. Goff. Shortly thereafter, Mr. McLeod withdrew as counsel and was replaced by Thomas Goggans. Mr. Wiggins, however, continued to represent Mr. Reeves.

---

[1] We later describe the medical and behavioral records that Mr. Reeves' counsel had in their possession prior to trial.

Mr. Goggans and Mr. Wiggins moved for and were granted access to Mr. Reeves' mental health records from the Taylor Hardin Secure Medical Facility, including records related to an evaluation performed by a clinical psychologist, Dr. Kathy Ronan, a few months earlier. But despite securing funding and obtaining the Taylor Hardin records, they never contacted Dr. Goff or hired any other neuropsychologist to evaluate Mr. Reeves for intellectual disability.

Instead, on the day of the sentencing phase of Mr. Reeves' trial, Mr. Goggans and Mr. Wiggins spoke to Dr. Ronan about Mr. Reeves for the first time and then called her to testify. Dr. Ronan had been appointed by the court to evaluate Mr. Reeves solely to assess his competency to stand trial and his mental state at the time of the offense. She had not conducted a sentencing-phase evaluation, which she later explained "would contain different components than those for the trial phase evaluations, and would be more extensive in terms of testing and background investigation." D.E. 23-15 at 11. She also had not evaluated Mr. Reeves for intellectual disability. Specifically, Dr. Ronan had not administered a full IQ test (she had administered only the verbal portion of the test), and she had not assessed Mr. Reeves' adaptive skills, both of which are necessary to properly evaluate intellectual disability. *See id.* at 10–12; D.E. 23-8 at 145.

Dr. Ronan nevertheless testified at the sentencing phase, based on her limited evaluation of Mr. Reeves, that he was in the "borderline range of intelligence." When

5

the state asked Dr. Ronan on cross-examination whether Mr. Reeves was intellectually disabled, she responded that "[h]e was not in a level that they would call . . . mental retardation." Mr. Reeves' trial counsel did not object, nor did they elicit testimony from Dr. Ronan on redirect about her inability to offer that opinion without having conducted the necessary intellectual disability evaluation.

Mr. Reeves' trial counsel presented two other witnesses during the sentencing phase. They called Detective Pat Grindle of the Selma Police Department, who described the poor condition of Mr. Reeves' childhood home. And they called Mr. Reeves' mother, Marzetta Reeves, who testified about various struggles in Mr. Reeves' childhood. For example, she testified that that his father was absent, that he repeated first grade and "either third or fourth grade," that he "had a hyperization problem" and "some learning disabilities," that he "got whipped a lot from [his grandmother] and his aunties," and that his brother Julius had significant influence over him.

During closing argument, the state emphasized that Mr. Reeves "chose his path"—that he was not a "victim of our society," but instead had "every resource . . . available," yet he "pushed it all away." The defense referenced Mr. Reeves' mental capacity only in passing: "You heard the psychiatrist or the psychologist as she talked about Matthew's upbringing. You heard her talk about the resources that were there and the resources that were not there. You heard Ms. Reeves talk about

6

first grade, his failing that. He went on through the system, and the third grade, he failed that. And in the eighth grade . . . because of his violent behavior, because of his condition, because he just wouldn't listen, wouldn't pay attention, didn't want to be in that environment he was kicked out of school . . ."

The jury recommended that Mr. Reeves be sentenced to death by a 10-2 vote, and the trial court subsequently imposed a death sentence. On direct appeal, the Alabama Court of Criminal Appeals affirmed, and Mr. Reeves' petitions for writ of certiorari to the Alabama Supreme Court and the U.S. Supreme Court were denied. *See Reeves v. State*, 807 So. 2d 18 (Ala. Crim. App. 2000), *cert. denied*, *Ex parte Reeves*, No. 1000234 (Ala. 2001), & *Reeves v. Alabama*, 534 U.S. 1026 (2001).

## C

Mr. Reeves timely petitioned for post-conviction relief pursuant to Rule 32 of Alabama's Rules of Criminal Procedure. Mr. Reeves asserted, among other claims, that his trial counsel were ineffective for failing to obtain an expert to evaluate him for intellectual disability—despite having sought and obtained funds to hire a neuropsychologist for that very purpose. He also argued that his counsel were ineffective for failing to retain a mitigation expert, and that his death sentence violated the Eighth Amendment because he is intellectually disabled.

The Rule 32 court held a two-day evidentiary hearing on Mr. Reeves' petition. Both sides presented witnesses at the hearing.

Mr. Reeves called Dr. Goff, whom post-conviction counsel had retained to evaluate him prior to the hearing. Dr. Goff testified—based on his review of Mr. Reeves' mental health and school records and the results of a battery of tests designed to assess Mr. Reeves' IQ, cognitive abilities, and adaptive functioning— that Mr. Reeves was intellectually disabled. Dr. Goff concluded, based on Mr. Reeves' IQ scores of 71 and 73, that he has significantly subaverage intellectual functioning. Dr. Goff also concluded that Mr. Reeves has significant deficits in multiple areas of adaptive functioning, including functional academics, self-direction, work, and health and safety. In addition, Dr. Goff testified that, had Mr. Reeves' trial counsel asked him to evaluate Mr. Reeves years earlier for the purpose of testifying at trial, he would have performed similar evaluations and reached the same conclusions.

Mr. Reeves also presented a mitigation expert, Dr. Karen Salekin, who testified about the neglect, domestic violence, drug abuse, and extreme poverty that he experienced as a child. Mr. Reeves did not call Mr. McLeod, Mr. Wiggins, or Mr. Goggans to testify.[2]

The state called Dr. Glen King, a clinical and forensic psychologist who also evaluated Mr. Reeves for the Rule 32 proceedings. Dr. King concluded that Mr. Reeves was "in the borderline range of intellectual ability." D.E. 23-25 at 234. Dr.

---

[2] At the time of the Rule 32 proceedings, Mr. Wiggins was an Alabama state judge.

8

King testified that Mr. Reeves had an IQ of 68, but that his "achievement scores [on other tests] indicate a level of functioning higher than the IQ scores actually indicated." *Id.* at 223–24. Although Dr. King found that Mr. Reeves achieved low test scores in three areas of adaptive functioning (domestic activity, work, and self-direction), he explained that other evidence indicated that he did not have substantial deficiencies in these areas.

The Rule 32 court denied Mr. Reeves' petition in 2009, but the order was not served on Mr. Reeves, his counsel, or the state until 2013. Because of this error, Mr. Reeves was granted leave to file an out-of-time appeal.

In 2016, the Court of Criminal Appeals affirmed the denial of Mr. Reeves' Rule 32 petition. *See Reeves v. State*, 226 So. 3d 711 (Ala. Crim. App. 2016). As relevant here, it concluded that the Rule 32 court did not abuse its discretion in denying Mr. Reeves' intellectual disability claim. *See id.* at 725–44. It also held that Mr. Reeves could not meet his burden of proving ineffective assistance of counsel because he did not call his trial counsel to testify at the Rule 32 hearing. *See id.* at 747–48. It explained that Mr. Reeves' "failure to call his attorneys to testify [was] *fatal* to his claims of ineffective assistance of counsel," because without such testimony "the record is silent as to the reasons trial counsel . . . chose not to hire Dr. Goff[.]" *Id.* at 749–51 (emphasis added).

9

The Alabama Supreme Court denied Mr. Reeves' petition for a writ of certiorari. *See Ex parte Reeves*, No. 1160053 (Ala. 2017). The U.S. Supreme Court also denied certiorari. *See Reeves v. Alabama*, 138 S. Ct. 22 (2017) (Mem.). Justice Sotomayor—joined by Justices Ginsburg and Kagan—dissented, explaining that the Court of Criminal Appeals' "imposition of a categorical rule that counsel must testify in order for a petitioner to succeed on a federal constitutional ineffective-assistance-of-counsel claim contravenes [Supreme Court] decisions requiring an objective inquiry into the adequacy and reasonableness of counsel's performance based on the full record before the court." *Id.* at 23.

Mr. Reeves then filed a federal habeas corpus petition. The district court denied relief, but granted Mr. Reeves a certificate of appealability on his claim that trial counsel were ineffective for failing to hire an expert to investigate his intellectual disability. We granted Mr. Reeves a certificate of appealability on his claims that he is intellectually disabled and that the Court of Criminal Appeals incorrectly required trial counsel's testimony to establish ineffectiveness.[3]

---

[3] We also granted a certificate of appealability on Mr. Reeves' claim that trial counsel were ineffective for failing to conduct a sufficient mitigation investigation or hire a defense mitigation expert. Given our ruling on trial counsel's ineffectiveness for failing to retain an expert to evaluate Mr. Reeves for intellectual disability, we do not reach whether trial counsel were also ineffective for failing to secure additional mitigation evidence.

**II**

The district court's denial of a § 2254 habeas corpus petition is subject to *de novo* review. *See Ward v. Hall,* 592 F.3d 1144, 1155 (11th Cir. 2010). Because Mr. Reeves filed his petition after April 24, 1996, however, this appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996. AEDPA "establishes a highly deferential standard for reviewing state court judgments." *Parker v. Sec'y, Dep't. of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003). Under AEDPA, a federal court may only grant a writ of habeas corpus if the state court's determination of a federal claim was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The phrase "clearly established Federal law" encompasses only the holdings of the Supreme Court of the United States "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court's determination is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A state court's determination is "an unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal

11

principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.  Reasonableness is an objective standard, and a federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that the state court was incorrect. *See id*. at 410.  *See also Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n unreasonable application . . . must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citation and internal quotation marks omitted).

Under § 2254(d)(2), we presume that a state court's findings of fact are correct unless rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations.  Instead, it must conclude that the state court's findings lacked even fair support in the record." *Rose v. McNeil*, 634 F.3d 1224, 1241 (11th Cir. 2011) (citations omitted).

### III

We first address Mr. Reeves' intellectual disability claim.

### A

Mr. Reeves argues that he is ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), which held that executing intellectually disabled individuals violates the Eighth Amendment.  Generally, a determination of whether

a person is intellectually disabled is a finding of fact. *See Fults v. GDCP Warden*, 764 F.3d 1311, 1319 (11th Cir. 2014).

Though *Atkins* left defining intellectual disability to the states, the Supreme Court noted that the medical community defines intellectual disability (then referred to as "mental retardation") as follows:

> *Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before 18.

*Atkins*, 536 U.S. at 308 n.3. The Alabama Supreme Court has similarly held that, for a defendant to prove that he is intellectually disabled under *Atkins*, he must show (1) that he has "significantly subaverage intellectual functioning (an IQ of 70 or below);" (2) that he has "significant or substantial deficits in adaptive behavior;" and (3) that these problems "manifested themselves during the development period (i.e., before the defendant reached age 18)." *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002). *See also Smith v. State*, 213 So. 3d 239, 248 (Ala. 2007) (same).

In *Hall v. Florida*, 572 U.S. 701, 721 (2014), the Supreme Court held that a determination of intellectual disability must be "informed by the medical community's diagnostic framework." The Court in *Hall* invalidated a Florida statute that defined intellectual disability based on a strict IQ test score cutoff of 70,

13

concluding that it contravened the established medical practice of taking into account the standard error of measurement. The standard error of measurement reflects "that an individual's score is best understood as a range of scores on either side of the recorded score." *Id.* at 713. The Court explained that "an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." *Id.* at 722 (citation and internal quotation marks omitted).

**B**

Mr. Reeves argues that the Court of Criminal Appeals' analysis of the first two prongs of the intellectual disability standard is both contrary to and an unreasonable application of *Hall*, as well as an unreasonable determination of the facts. *See* Appellant's Initial Br. at 25–38. We disagree.[4]

In analyzing the first prong, the Court of Criminal Appeals interpreted *Hall* to mean that "an IQ score, alone, is not determinative of intellectual disability or even of the intellectual-functioning prong of intellectual disability." *Reeves*, 226 So. 3d at 740. Thus, although Mr. Reeves had full-scale IQ scores of 68, 71, and 73, the Court of Criminal Appeals concluded that the Rule 32 court did not abuse its discretion by finding—based on all the evidence presented and after observing Mr. Reeves when

---

[4] The Court of Criminal Appeals did not reach the third prong, regarding whether the intellectual disability manifested before the age of 18. *See Reeves*, 226 So. 3d at 743 n.15.

14

he testified at a pretrial hearing—that his intellectual functioning was not significantly subaverage. *See id.* at 741.

Turning to the second prong, the Court of Criminal Appeals similarly stated that a court "is not *required* to find that a person suffers from significant deficits in adaptive functioning merely because that person's scores on a standardized test indicate such deficits." *Id.* at 741–42. It reasoned that, although testing performed by both experts reflected that Mr. Reeves had adaptive deficits in certain areas, "other evidence was presented that either called into question the validity of those scores and/or indicated that [Mr. Reeves'] deficits in those areas were not, in fact, *significant*." *Id.* at 742.

Mr. Reeves contends that the Court of Criminal Appeals deviated from the medical community's diagnostic framework in evaluating his intellectual functioning because it did not place enough weight on his IQ scores. *See* Appellant's Initial Br. at 27–33. He also asserts that the Court of Criminal Appeals' analysis of his adaptive functioning contravened established medical standards because it treated his adaptive strengths as negating his adaptive deficits. *See id.* at 36–38. For this latter point, he relies on *Moore v. Texas*, 137 S. Ct. 1039, 1050 (2017), which clarified that "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." As we have stated, "[a]fter *Moore*, states cannot 'weigh' an

15

individual's adaptive strengths against his adaptive deficits." *Smith v. Ala. Dep't of Corr.*, 924 F.3d 1330, 1337 (11th Cir. 2019).

Assuming without deciding that the Court of Criminal Appeals unreasonably applied *Hall* with respect to the first prong of the intellectual disability standard, Mr. Reeves cannot prevail on his *Atkins* claim. The Court of Criminal Appeals did not unreasonably apply *Hall* in analyzing the second prong.[5]

**1**

Under *Teague v. Lane*, 489 U.S. 288 (1989), and its progeny, cases establishing new constitutional rules of criminal procedure generally cannot be applied retroactively on collateral review. *See Welch v. United States*, 136 S. Ct. 1257, 1264 (2016). We therefore address whether *Hall* and *Moore* apply to Mr. Reeves' claim, as both opinions were issued after Mr. Reeves' conviction and sentence became final in 2001, and *Moore* was issued after the Court of Criminal Appeals denied post-conviction relief. *See Caspari v. Bohlen*, 510 U.S. 383, 389

---

[5] To the extent that Mr. Reeves claims that the Court of Criminal Appeals' opinion is an unreasonable application of *Atkins*, we reject that argument. "*Atkins* did not define intellectual disability, nor did it direct the states on how to define intellectual disability . . . Rather, *Atkins* expressly left it to the states to develop 'appropriate ways to enforce the constitutional restriction' on executing the intellectually disabled." *Kilgore v. Secretary, Fla. Dep't of Corr.*, 805 F.3d 1301, 1311 (11th Cir. 2015) (quoting *Atkins*, 536 U.S. at 317). The Court of Criminal Appeals therefore did not unreasonably apply *Atkins* in evaluating whether Mr. Reeves was intellectually disabled.

(1994) ("A threshold question in every habeas case . . . is whether the court is obligated to apply the *Teague* rule to the defendant's claim.").[6]

We do not apply *Moore* to Mr. Reeves' *Atkins* claim for two reasons. First, *Moore* was decided after the Court of Criminal Appeals issued the relevant state-court decision in 2016, and therefore it was not "clearly established" law under § 2254(d)(1). *See Shoop v. Hill*, 139 S. Ct. 504, 507–08 (2019) (summarily vacating the Sixth Circuit's grant of habeas relief because it was improperly based on *Moore*, a case "which was not handed down until long after the state-court decisions" that were relevant for purposes of the § 2254(d) analysis). Second, we have held that *Moore* "announced a new rule" that does not apply retroactively under *Teague*. *See Smith*, 924 F.3d at 1338–39.

Unlike *Moore, Hall* had been decided at the time the Court of Criminal Appeals issued its opinion in the Rule 32 appeal. In reviewing Mr. Reeves' claim, the Court of Criminal Appeals applied *Hall*, rejecting the state's argument that *Hall* does not apply retroactively to cases on collateral review. *See Reeves*, 226 So. 3d at 727 n.7. Although the Court of Criminal Appeals was free to apply *Hall* as a matter of state law, s*ee Danforth v. Minnesota*, 552 U.S. 264, 282 (2008), its retroactivity

---

[6] *Atkins* was decided in 2002, also after Mr. Reeves' conviction and sentence became final, but we have held that *Atkins*—which announced a substantive rule of constitutional law—applies retroactively. *See In re Holladay*, 331 F.3d 1169, 1173 (11th Cir. 2003) ("[T]here is no question that the new constitutional rule . . . articulated in *Atkins* is retroactively applicable to cases on collateral review.").

17

determination does not govern whether *Hall* applies retroactively in federal court. *See Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1333 (11th Cir. 2019) ("[A] state-law retroactivity determination has no significance in federal court . . . if the government raises the issue, a *Teague* analysis is mandatory.").

We have held that *Hall* sets forth a new rule of criminal procedure that does not apply retroactively under *Teague*.  *See In re Henry*, 757 F.3d 1151, 1158–59 (11th Cir. 2014); *In re Hill*, 777 F.3d 1214, 1223 (11th Cir. 2015); *Kilgore v. Secretary, Fla. Dep't of Corr.*, 805 F.3d 1301, 1313–16 (11th Cir. 2015).  Although we would normally follow this precedent, a state can waive a *Teague* nonretroactivity argument.  *See Caspari*, 114 S. Ct. at 953 ("[A] federal court may, but need not, decline to apply *Teague* if the State does not argue it.").  Here, despite the existence of cases like *Henry*, *Hill*, and *Kilgore*, the state has failed to argue on appeal that *Hall* is not retroactive.  In fact, it has chosen to address *Hall* on the merits. *See* State's Answer Br. at 24, 30.  We therefore consider whether the Court of Criminal Appeals unreasonably applied *Hall*.[7]

---

[7] Although Mr. Reeves also says that the opinion of the Court of Criminal Appeals is "contrary to" *Hall*, he does not argue that it failed to identify the correct legal standard or refused to apply Supreme Court precedent that involved materially indistinguishable facts. *See Williams*, 529 U.S. at 413.  His contention is better characterized as an "unreasonable application" argument, as he acknowledges that the Court of Criminal Appeals identified the correct legal principles but contends that it unreasonably applied those standards to his case. *See id.*

18

**2**

*Hall* does not provide guidance as to how a court is to analyze the adaptive deficits prong of the intellectual disability standard, other than saying that the analysis is informed by the medical community's diagnostic framework. *See Hall*, 572 U.S. at 721. *See also Mays v. Stephens*, 757 F.3d 211, 218 (5th Cir. 2014) (explaining that *Hall* does not dictate what kinds of evidence a court might consider when determining adaptive functioning, and "[i]nstead, . . . exclusively addresses the constitutionality of mandatory, strict IQ cutoffs"); *Arbelaez v. Fla. Dep't of Corr.*, 662 F. App'x 713, 723 (11th Cir. 2016) ("Nothing in the holdings of *Atkins* or *Hall* speaks directly to the methodology for discerning an individual's deficits in adaptive functioning.").

Mr. Reeves argues that prevailing medical standards make clear that the focus should be on adaptive *deficits*, not adaptive *strengths*. *See* Appellant's Initial Br. at 37. To the extent that the Court of Criminal Appeals may have improperly balanced Mr. Reeves' adaptive strengths against his adaptive deficits, the Supreme Court did not hold that this was improper until *Moore*. "[W]hile that approach today would be contrary to clearly established federal law—that is, contrary to *Moore* . . .—it was neither contrary to nor an unreasonable application of clearly established Supreme Court law when" the Court of Criminal Appeals affirmed the denial of Mr. Reeves' Rule 32 petition. *See Clemons v. Comm'r, Ala. Dep't of Corr.*, 967 F.3d 1231, 1250

(11th Cir. 2020). *See also Smith*, 924 F.3d at 1343 (explaining that, although the Alabama courts had improperly reasoned that the petitioner's adaptive strengths outweighed his deficits, this approach was acceptable until *Moore*).

In any event, the Court of Criminal Appeals did not treat Mr. Reeves' adaptive strengths as overriding his adaptive deficits; instead, it weighed conflicting evidence and concluded—based on Dr. King's testimony and other record evidence—that Mr. Reeves' adaptive deficits were not significant, despite his low test scores in certain areas. *See Reeves*, 226 So. 3d at 742.

Although Dr. King testified that Mr. Reeves achieved low test scores in domestic activity, work, and self-direction, he also explained that other evidence indicated that Mr. Reeves did not have substantial deficits in these areas. For example, the Court of Criminal Appeals relied on Dr. King's testimony that Mr. Reeves scored low in domestic activity "because [he] had never been required to do any type of domestic activity growing up and had been incarcerated since he was 18 years old." *Id.* It also cited testimony by Dr. King that he would have scored Mr. Reeves higher in "self-direction" had he known at the time of the evaluation that Mr. Reeves had been "involved in a lot of drug activity and was actually directing the behaviors and activities of others[.]" *Id.*

The Court of Criminal Appeals further relied on Dr. King's conclusion that Mr. Reeves scored low in the work domain because he "did not get to the age where

he might be able to master use of complex job tools or equipment" before he was incarcerated. *See id.* And it recounted other evidence confirming that Mr. Reeves has at least some vocational skills. He had certificates in brick masonry, welding, and automobile mechanics, and held a construction job while his brother was incarcerated. *See id.* at 742–43.

In addition, the Court of Criminal Appeals noted that although Mr. Reeves scored low in the health and safety, self-care, and leisure domains on the test administered by Dr. Goff, he achieved high scores in these areas in tests administered by Dr. King. *See id.* at 743. It viewed certain evidence—that Mr. Reeves "sold drugs to make money" and "used that money to buy personal belongings for himself, including a car, and to help pay the household bills"—as demonstrating that he could care for himself. *See id.* Finally, the Court of Criminal Appeals credited Dr. King's testimony that Mr. Reeves could read at a fifth-grade level, and Dr. Goff acknowledged that reading at that level "would not qualify as a *significant* deficit in functional academics." *Id.*

In sum, the Court of Criminal Appeals did not unreasonably apply *Hall* by relying on this evidence to find that Mr. Reeves did not have substantial deficits in at least two areas. We reiterate that a determination of whether a person is intellectually disabled is a finding of fact, *see Fults*, 764 F.3d at 1319, and under AEDPA such a finding is presumed to be correct. Even if we may have viewed the

evidence differently, "we are not sitting as the initial triers of fact determining whether [Mr. Reeves] is in fact [intellectually disabled]. We are not even assessing factual findings made by a district court for clear error. We are reviewing the factual findings of the state habeas court through the prism of AEDPA, which calls for a presumption of correctness that can only be overcome by clear and convincing evidence." *Id.* at 1321. Accordingly, we affirm the district court's denial of relief on Mr. Reeves' *Atkins* claim.

## IV

We now turn to Mr. Reeves' claim that he received ineffective assistance of counsel in violation of the Sixth Amendment. Mr. Reeves must establish two elements to prevail on this claim: (1) deficient performance of counsel; and (2) resulting prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To prove deficiency, Mr. Reeves must show that his trial "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In considering counsel's performance, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. "To overcome that presumption, [Mr. Reeves] must show that counsel failed to act reasonably considering all the circumstances." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation and internal quotation marks omitted).

To prove prejudice, Mr. Reeves "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" does not mean that counsel's performance "more likely than not altered the outcome." *Nix v. Whiteside*, 475 U.S. 157, 175 (1986). Instead, a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Under AEDPA, Mr. Reeves is "entitled to relief only if the state court's rejection of his claim of ineffective assistance of counsel was 'contrary to, or involved an unreasonable application of,' *Strickland*, or rested on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting § 2254(d)). If the Court of Criminal Appeals unreasonably applied *Strickland*, then we review Mr. Reeves' ineffectiveness claim without AEDPA deference. *See McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) ("Where we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d), we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record.").

23

**A**

In rejecting Mr. Reeves' ineffective assistance of counsel claims, the Court of Criminal Appeals held that, "to overcome the strong presumption of effectiveness, *a Rule 32 petitioner must, at his evidentiary hearing, question trial counsel regarding his or her actions and reasoning.*" *Reeves*, 226 So. 3d at 748. It concluded, based on this categorical rule, that Mr. Reeves' "failure to call his attorneys to testify [was] *fatal* to his claims," *id.* at 749 (emphasis added), without considering the extensive evidence before it about counsel's performance or explaining why this other evidence did not establish ineffectiveness. By treating Mr. Reeves' failure to call his counsel to testify as a *per se* bar to relief—despite ample evidence in the record to overcome the presumption of adequate representation—the Court of Criminal Appeals unreasonably applied *Strickland*.

*Strickland* established a "presumption" of reasonable performance, but it also made clear that the presumption may be "overcome." 466 U.S. at 689. *See also Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (recognizing that, although under *Strickland* counsel's competence is presumed, the defendant may "rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms"). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not

24

whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Rather than creating (or even permitting) a *per se* rule that the petitioner must present counsel's testimony to rebut the presumption, *Strickland* emphasized that counsel's performance must be judged "on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *See also id.* at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering *all the circumstances*.") (emphasis added). "Most important, in adjudging a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules." *Id.* at 696. *See also Rompilla v. Beard*, 545 U.S. 374, 381 (2005) ("A standard of reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules[.]"); *id.* at 393–94 (2005) (O'Connor, J., concurring) ("[T]oday's decision simply applies our longstanding *case-by-case approach* to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*[.]") (emphasis added).

The Supreme Court has ruled that state courts unreasonably applied *Strickland* by requiring a petitioner to additionally show on the prejudice prong that the result of the proceeding was fundamentally unfair, *see Williams*, 529 U.S. at 393–95; by "deferring to counsel's decision not to pursue a mitigation case despite their

25

unreasonable investigation," *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); and by concluding that, rather than examine their client's prior conviction file, counsel could ask the client and family relatives whether they recalled anything helpful or damaging in the prior victim's testimony, *see Rompilla*, 545 U.S. at 388–89. Here, we agree with Justice Sotomayor that the Court of Criminal Appeals unreasonably applied *Strickland* by creating a categorical rule requiring the testimony of counsel:

> *Strickland* and its progeny establish that when a court is presented with an ineffective-assistance-of-counsel claim, it should look to the full record presented by the defendant to determine whether the defendant satisfied his burden to prove deficient performance. The absence of counsel's testimony may make it more difficult for a defendant to meet his burden, but that fact alone does not absolve a court of its duty to look at the whole record and evaluate the reasonableness of counsel's professional assistance in light of that evidence.

*Reeves*, 138 S. Ct. at 26 (Sotomayor, J., dissenting from the denial of certiorari). If the Court of Criminal Appeals were correct, then an ineffectiveness claim would be barred as a matter of law if counsel had passed away or did not recall the reasons for his conduct. Its *per se* rule is objectively unreasonable.[8]

---

[8] We recognize that only Supreme Court cases constitute clearly established law under § 2254(d). We note, however, that we have considered the totality of the evidence in evaluating ineffectiveness claims where trial counsel has not been able to provide meaningful testimony at a post-conviction hearing, either because he had passed away or could not recall the pertinent events. *See Williams v. Head*, 185 F.3d 1223, 1227–28 & 1234–35 (11th Cir. 1999) (considering the totality of the evidence regarding mitigation investigation where trial counsel's recollection of events was hampered due to the loss of the case file); *Callahan v. Campbell*, 427 F.3d 897, 933–36 (11th Cir. 2005) (examining the reasonableness of trial counsel's performance in light of the evidence in the record even though trial counsel did not testify at the Rule 32 hearing because he had passed away).

26

That *Strickland* does not demand counsel's testimony is also clear from cases in which the Supreme Court found ineffectiveness due to failure to investigate despite such testimony. In those cases, the Court based its review on the full record. *See id.*

For example, in *Williams*, 529 U.S. at 392, the Supreme Court held that the Virginia Supreme Court's decision rejecting the petitioner's ineffectiveness claim was both contrary to, and an unreasonable application of *Strickland*. Though trial counsel testified about his strategic decision before the state habeas court, *see id.* at 373, the Court nonetheless concluded that "the failure to introduce the comparatively voluminous amount of" mitigating evidence "was not justified by a tactical decision[.]" *Id.* at 396. Instead, the Court determined—based on the totality of the evidence in the record—that counsel did not "fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.* Specifically, the Court explained that "[t]he record establishes that counsel did not begin to prepare for [the sentencing] phase of the proceeding until a week before the trial," that counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [the petitioner's] nightmarish childhood," and that "[c]ounsel failed to introduce available evidence that [the petitioner] was 'borderline mentally retarded'" or "even to return he phone call of a certified public accountant who had

offered to testify that he had visited [the petitioner] frequently" in prison and he seemed to thrive in a more structured environment. *See id.* at 395–96.

Similarly, in *Wiggins*, the Supreme Court held that the Maryland Court of Appeals unreasonably applied *Strickland* in rejecting the petitioner's claim that his trial attorneys rendered ineffective assistance by failing to investigate and present mitigating evidence. Though trial counsel testified that they made a strategic decision to focus on "retry[ing] the factual case" and dispute the petitioner's responsibility for the murder, *see* 539 U.S. at 517, the Supreme Court proceeded to "conduct an objective review of their performance." *Id.* at 523.

In doing so, the Court considered other evidence in the record, noting that trial counsel had available to them a written PSI, which included a one-page account of the petitioner's personal history, and records from the city department of social services. *See id.* The Court concluded that "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of" professional standards, and that the "scope of their investigation was also unreasonable in light of what counsel actually discovered in the . . . records." *Id.* at 524–25. Namely, the records revealed that the petitioner was "shuttled from foster home to foster home," that his mother was an alcoholic, that he had frequent, lengthy absences from school, and that on at least one occasion, he was left alone for days without food. *See id.* at 525. The Court also noted that "[d]espite the fact that the Public Defender's office

made funds available for the retention of a forensic social worker, counsel chose not to commission [a social history] report." *Id.* at 524. The record thus established the unreasonableness of counsel's conduct, despite their testimony about having made a strategic decision.

And in *Porter*, 558 U.S. at 39–40, the Supreme Court again concluded that trial counsel's decision not to investigate mitigating evidence "did not reflect reasonable professional judgment," despite trial counsel's testimony at the postconviction hearing. Reviewing counsel's performance *de novo*, the Supreme Court explained that the record reflected that "like the counsel in *Wiggins*, [trial counsel] ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 40. For instance, the court-ordered competency evaluations indicated that the petitioner spent very few years in regular school, served in the military and sustained wounds in combat, and noted his father's "over discipline." *Id.* Yet counsel did not further investigate, and "thus failed to uncover and present any evidence of [the petitioner's] mental health or mental impairment, his family background, or his military service." *Id.*

These Supreme Court cases demonstrate that, even when trial counsel does testify that a decision not to investigate was made for a strategic reason, that testimony may not establish adequate performance if it is rebutted by other evidence in the record. As Justice Sotomayor stated: "It cannot be, then, that such testimony

is necessary in every case. Where counsel does not testify but the defendant offers other record evidence, a court can simply presume that counsel would have justified his actions as tactical decisions and then consider whether the record rebuts the reasonableness of the justification." *Reeves*, 138 S. Ct. at 27 (Sotomayor, J., dissenting from the denial of certiorari).

Finally, the Supreme Court's opinion in *Massaro v. United States*, 538 U.S. 500 (2003), further indicates that trial counsel's testimony is not required for an ineffective assistance of counsel claim. There, the Supreme Court held that failing to raise an ineffective assistance of counsel claim on direct appeal does not bar the claim from being brought in a later post-conviction proceeding under § 2255. *See id.* at 509. But it declined to hold that ineffective-assistance claims *must* be reserved for collateral review, recognizing that "[t]here may be cases in which trial counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal. There may be instances, too, when obvious deficiencies in representation will be addressed by an appellate court *sua sponte*." *Id.* at 508. The Court thus acknowledged that, in at least some cases, ineffectiveness may be established based on the trial record and without testimony from trial counsel or any other evidence presented on post-conviction review.

In view of these cases, "[t]here can be no dispute that the imposition of a categorical rule that counsel must testify in order for a petitioner to succeed on a

federal constitutional ineffective-assistance-of-counsel claim contravenes [the Supreme Court's] decisions requiring an objective inquiry into the adequacy and reasonableness of counsel's performance based on the full record before the court." *Reeves*, 138 S. Ct. at 23 (Sotomayor, J., dissenting from the denial of certiorari). The Court of Criminal Appeals' decision contravenes the command of *Strickland* that courts are to consider "all the circumstances" rather than applying "mechanical rules." *Strickland*, 466 U.S. at 688, 696. The Court of Criminal Appeals thus unreasonably applied *Strickland* by applying a *per se* rule that trial counsel's failure to testify was fatal to Mr. Reeves' ineffective assistance of counsel claims, and by refusing to consider or discuss the evidence in the record, discussed below, establishing counsel's deficient performance.

**B**

Because the Court of Criminal Appeals unreasonably applied *Strickland*, "we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record" to determine whether trial counsel's performance was deficient. *See McGahee*, 560 F.3d at 1266. The Court of Criminal Appeals never reached whether trial counsel's failure to retain a neuropsychologist was deficient, as its decision rested solely on the lack of testimony from trial counsel at the Rule 32 hearing.

As the Supreme Court explained in *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

31

investigations unnecessary." 466 U.S. at 691. The Supreme Court has further instructed that "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527–28 (holding that "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible" in light of what the records that they reviewed "actually revealed"). *See also Porter*, 558 U.S. at 40 (holding that counsel performed deficiently because he "ignored pertinent avenues for investigation of which he should have been aware").

Here, under *Williams*, *Wiggins*, and *Porter*, the totality of the evidence establishes that trial counsel ceased their investigation at an "unreasonable juncture." *Wiggins*, 539 U.S. at 527. The record includes trial counsel's own statements that retaining a neuropsychologist to evaluate Mr. Reeves was "the only avenue open to the defense to compile" the "hundreds of pages of psychological, psychometric, and behavioral analysis material relating to" Mr. Reeves. *See* D.E. 23-1 at 74–75. Trial counsel also acknowledged that they had "hundreds" of pages of documents, including records from the Department of Youth Services, school records, and other mental health records that they believed would be "exceptionally pertinent at the penalty phase." D.E. 23-3 at 96. They further represented that a neuropsychologist

was necessary "to assist [counsel] in the mitigation phase of the case," even stating that waiting until after the guilt phase to retain someone would be "a little late." D.E. 23-3 at 92–93.

Indeed, trial counsel twice requested that the court appoint such an expert— only to then neglect to hire Dr. Goff or any other neuropsychologist once the court granted the request for funds. They never even contacted Dr. Goff, despite having over three months to do so—as the funds to hire him were granted on October 16, 1997, and the trial began on January 26, 1998.

This conduct is particularly unreasonable and deficient in light of what trial counsel actually knew about the need for an intellectual disability evaluation. *See Wiggins*, 539 U.S. at 505. Among other things, the documents that trial counsel had in their possession before trial included:

- Mental health records from the Cahaba Center for Mental Health reflecting that Mr. Reeves was treated at the center for behavioral problems and ADHD beginning when he was eight years old, that he was re-admitted for treatment when he was 10 years old, and noting that "his intelligence is somewhat below average" and his "[j]udgment and insights are poor." *See* D.E. 23-19 at 1064–65; D.E. 23–20 at 12.

- Records reflecting that Mr. Reeves was administered an IQ test when he was 14 years old and obtained a verbal IQ score of 75, a performance IQ score of 74, and a full-scale IQ score of 73. These records state that he is in the "borderline range of intellectual functioning" and that he has "severe deficiencies in non-verbal social intelligence skills and his ability to see consequences." D.E. 23-20 at 13, 57.

- Mental health and school records demonstrating that Mr. Reeves failed the first, fourth, and fifth grades, that he was placed in special education services

33

for "emotional conflict," that he was "socially promoted to the seventh grade," and that he was expelled in eighth grade. *See* D.E. 23-20 at 12, 43, 88–90, 156.

- An outpatient forensic evaluation report from the Alabama Department of Mental Health and Mental Retardation describing Mr. Reeves as having "below normal intellectual functioning" in June of 1997. *See* D.E. 23-19 at 981–88.

The record further reflects that—in contravention of their own statement that waiting until after the guilt phase would be too late—trial counsel did not speak to Dr. Ronan about testifying on Mr. Reeves' behalf until the day of the penalty phase. And, despite specifically requesting the appointment of a *neuropsychologist* to do an intellectual disability evaluation for mitigation, trial counsel relied on Dr. Ronan—a *clinical psychologist* who had evaluated Mr. Reeves only for competency to stand trial and his mental state at the time of the offense, and who had not conducted an intellectual disability evaluation for mitigation.

At the Rule 32 proceedings, Mr. Reeves submitted an affidavit from Dr. Ronan, in which she explained that she "was not requested to complete a sentencing phase evaluation," and she "had not conducted an extensive clinical evaluation regarding mental retardation as that was not within the scope of [her] evaluation." D.E. 23-15 at 10. Specifically, Dr. Ronan testified that an "evaluation for [c]apital sentencing would contain different components than those for the trial phase evaluations, and would be more extensive in terms of testing and background investigation." *Id.* at 11. For example, Dr. Ronan only administered the verbal

34

portion of an IQ test. Had she been conducting an intellectual disability evaluation, the entire IQ test "would be required to be given," and further investigation into adaptive functioning would have been necessary. *See id.* The state's own expert, Dr. King, acknowledged that a "full scale IQ test" should be given to evaluate intellectual disability. *See* D.E. 23-25 at 52.

Dr. Ronan further stated in her affidavit that "[a]ttorneys were routinely informed as to the limitations" of her testimony for the capital penalty phase, "in that the original evaluation was not performed for that purpose." D.E. 23-15 at 10. Despite this, Mr. Reeves' trial counsel called Dr. Ronan as a witness. Under the circumstances and our cases, it was not reasonable for trial counsel to rely on Dr. Ronan, as she had only performed a competency evaluation and they did not speak to her until the day of the penalty phase. *See Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1273–74 (11th Cir. 2014) (holding that no lawyer could reasonably forego the pursuit of mitigation evidence on the defendant's mental health "based on the results of [a] pre-trial report governing competency to stand trial" because competency cannot be equated with guilt-phase mental health defenses). *See also Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("Regarding mental health evidence, our court has distinguished between its use during the guilt phase to establish competency to stand trial and presenting mental health mitigating evidence at the penalty phase."); *Blanco v. Singletary*, 943 F.2d

1477, 1503 (11th Cir. 1991) ("One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.").

In denying relief on Mr. Reeves' ineffective assistance of counsel claim, the district court noted that the records obtained by trial counsel indicated that Mr. Reeves was in the borderline range of intellectual functioning. As a result, the district court concluded that they "cannot reasonably be faulted for failing to pursue further expert inquiry into [his] intellectual functioning[.]" D.E. 29 at 49.[9]

But as the Supreme Court stated in *Strickland*, "strategic choices made after *less than complete investigation* are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91 (emphasis added). Given that trial counsel had already obtained the funds to retain Dr. Goff—and was well aware that Mr. Reeves' intellectual ability was an important issue—counsel should have at least had his mental capacity *evaluated* so that they could "mak[e] an informed choice among possible defenses."

---

[9] The Rule 32 court similarly concluded that when Dr. Ronan's testimony is considered together with the records collected by trial counsel, "there was no indication of a diagnosis of mental retardation." D.E. 23-16 at 155. But because the Court of Criminal Appeals applied its *per se* rule requiring trial counsel's testimony, it did not analyze counsel's conduct and did not pass on the Rule 32 court's analysis. We therefore review only the decision of the Court of Criminal Appeals. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion," a "federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable").

*Wiggins*, 539 U.S. at 525. *See also Williams*, 529 U.S. at 396 (holding that counsel's failure to investigate and present mitigating evidence was deficient even though "not all of the additional evidence was favorable to Williams"); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1306–07 & 1312 n.6 (11th Cir. 2016) (holding that counsel's performance was deficient because he did not have the defendant evaluated by a mental health expert despite evidence that neuropsychological testing was needed, even though there were also other unfavorable psychological evaluations in the defendant's records, including notations that he was not suffering from any mental illness). *Cf. Sealey v. Warden*, 954 F.3d 1338, 1356 (11th Cir. 2020) (noting that trial counsel's decision not to further investigate the petitioner's mental health, despite having requested and received funding from the trial court for a complete psychological evaluation, was "deeply troubling").

We recognize, of course, that because a habeas petitioner bears the burden of proving that his counsel's performance was deficient, "the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, 571 U.S. 12, 17 (2013) (citation and internal quotation marks omitted); *Chandler v. United States*, 218 F.3d 1305, 1314 n.5 (11th Cir. 2000) (same). Presenting counsel's testimony at a post-conviction hearing may, therefore, be necessary to prove deficiency where the record is otherwise silent. For example, in *Jenkins v. Alabama Department of Corrections*,

USCA11 Case: 19-11779    Date Filed: 11/10/2020    Page: 38 of 45

963 F.3d 1248, 1265–66 (11th Cir. 2020), we held under AEDPA deference that a petitioner claiming his counsel was ineffective for failing to investigate and present mitigating evidence could not meet his burden of overcoming the presumption of competence, in part because the attorney who was responsible for the penalty phase did not testify at the Rule 32 hearing. The "record [was] silent as to [counsel's] thoughts and intentions as he prepared for the penalty phase," and the "limited record" that the petitioner did develop undermined his assertion that counsel prepared inadequately. *See id.*

Where the record is not silent, however, counsel's testimony is not necessarily required. For instance, in *Buck v. Davis*, 137 S. Ct. 759, 775 (2017), the Supreme Court recently found deficient performance in a case where the state and lower federal courts had concluded that the ineffective assistance of counsel claim was procedurally defaulted. *See id.* (finding deficient performance where, during the penalty phase, trial counsel introduced testimony from an expert that the defendant had a greater propensity for violence because of his race, as "[n]o competent defense attorney would introduce such evidence about his own client"). It reached this conclusion even though it appears that counsel did not testify at any post-conviction hearing. *See id.* at 769–770. Neither the Supreme Court, Fifth Circuit, nor district court opinions referenced any testimony from trial counsel. *See id*. at 775–76. *See also Buck v. Stephens*, 623 F. App'x 668 (5th Cir. 2015); *Buck v. Stephens*, No. H-

38

04-3965, 2014 WL 11310152 (S.D. Tex. Aug. 29, 2014); *Buck v. Thaler*, 452 F.

App'x 423 (5th Cir. 2011); *Buck v. Thaler*, 345 F. App'x 923 (5th Cir. 2009).

Here, as in *Buck*, the record is not silent. The record establishes that trial

counsel ended their investigation of Mr. Reeves' intellectual ability at an

unreasonable time. They had numerous records pointing to Mr. Reeves' low

intelligence and educational failures. And yet they failed to even contact Dr. Goff

after proclaiming their need for him and obtaining the funds to retain him. In view

of their awareness of the need for an intellectual disability evaluation, there can be

no valid strategic reason for this decision. Trial counsel's performance was thus

deficient, given what Mr. Reeves' records revealed.

## C

As explained in cases like *Brownlee v. Haley*, 306 F.3d 1043, 1049–50 (11th

Cir. 2002), at the time of Mr. Reeves' trial and sentencing hearing in 1998, an

Alabama jury performed an advisory role in a capital sentencing proceeding. The

jury, after hearing the evidence presented by the parties at the second phase of a

bifurcated proceeding, issued an advisory verdict recommending a sentence to the

trial court based on its evaluation of aggravating and mitigating factors. If the jury

found no statutory aggravating circumstances, or found that the statutory

aggravating circumstances did not outweigh the mitigating circumstances, it had to

return an advisory verdict recommending a sentence of life imprisonment without

parole. *See* Ala. Code § 13A-5-46(e)(1)–(2) (2001). If, on the other hand, the jury found that one or more statutory aggravating circumstances outweighed the mitigating circumstances, it had to return an advisory verdict recommending a sentence of death. *See* Ala. Code § 13A-5-46(e)(3) (2001). The decision to recommend a sentence of death had to be based on a vote of at least 10 jurors. *See* Ala. Code § 13A-5-46(f) (2001). The trial court, based upon its independent determination and weighing of the aggravating circumstances, made the final decision as to the appropriate sentence. *See* Ala. Code § 13A-5-47(d)–(e) (2001).[10]

The Court of Criminal Appeals did not reach the prejudice prong here, so we review this element of the *Strickland* claim *de novo*. *See Rompilla*, 545 U.S. at 390. "Given that the jury here recommended a sentence of death by the narrowest possible vote, 10 to 2, [Mr. Reeves] need establish only 'a reasonable probability that at least one juror would have struck a different balance' between life and death." *Jenkins*, 963 F.3d at 1270 (quoting *Wiggins*, 539 U.S. at 537). He "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. In assessing the reasonable probability of a different result, we "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh

---

[10] In 2017 Alabama amended its capital sentencing scheme. *See* 2017 Ala. Laws Act 2017-131 (S.B. 16) (amending, e.g., Ala. Code. §§ 13A-5-46, 13A-5-47). The new provisions are not before us in this appeal.

it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (internal citation, quotation marks, and alteration omitted).

In sentencing Mr. Reeves, the trial court found only one aggravating circumstance: that the offense was committed during the course of a robbery. On the other hand, the trial court found two statutory mitigating circumstances, his lack of significant prior criminal activity and his age at the time of the offense, and two non-statutory mitigating circumstances: he grew up in a poor home environment without appropriate developmental resources and responds positively when placed in a structured environment.

Although Mr. Reeves is not ineligible for the death penalty under *Atkins*, the jury or trial court might have found other statutory or non-statutory mitigating factors had evidence of his intellectual disability been presented, and thus weighed the aggravating and mitigating circumstances differently. As Mr. Reeves asserts, *see* Appellant's Initial Br. at 64, his mental capacity is relevant to the statutory mitigating circumstance of "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," Ala. Code § 13A-5-51(6) (2001), and two non-statutory mitigating factors under Ala. Code § 13A-5-52 (2001) ("mitigating circumstance shall include . . . any other relevant mitigating circumstance which the defendant offers"). *See also Brownlee*, 306 F.3d at 1071–73 (explaining that the jury could have found a non-statutory

mitigating circumstance based on the petitioner's "borderline intellectual functioning and psychiatric disorders"). *Cf. Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (recognizing that evidence of impaired intellectual functioning is "inherently mitigating" even if the petitioner does not "establish a nexus between [his] mental capacity and [his] crime"); *Atkins*, 536 U.S. at 305 ("Mentally retarded persons . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. Their deficiencies do not warrant an exemption from criminal sanctions, but diminish their personal culpability.").

The mitigating evidence that counsel failed to obtain and present was powerful. At the Rule 32 hearing, Dr. Goff testified that Mr. Reeves was "mentally retarded." He also testified that Mr. Reeves read at a third-grade level, his other academic skills were at a fourth-grade level, and he spelled at a fifth-grade level, and that Mr. Reeves has had significant deficits in self-direction, functional academics, work activities, and health and safety throughout his life.

The district court concluded that Mr. Reeves failed to show prejudice because the jury was informed of his "lower intellectual functioning multiple times during the penalty phase[.]" D.E. 29 at 50–51. During the penalty phase, however, trial counsel only presented evidence that he was in the "borderline" range of intellectual

ability, not that he was intellectually disabled. Indeed, the only evidence they put on about his mental capacity undermined that finding, as the sole witness to testify as to his intellectual ability during the penalty phase—Dr. Ronan—stated on cross examination "[h]e was not in a level that they would call . . . mental retardation." Trial counsel did not object or clarify on re-direct examination that Dr. Ronan had not conducted the necessary evaluation to make that determination. The jury thus never heard from a qualified expert who had fully evaluated Mr. Reeves that he was "mentally retarded." In fact, they were told the opposite.

The jury or the trial court may have found Dr. Goff's testimony particularly relevant in light of Dr. Ronan's and Dr. Salekin's testimony that Mr. Reeves was negatively influenced by his brother Julius—who was present for the offense and conceived of the idea to rob Mr. Johnson—and that his low intellectual functioning made him particularly susceptible to the influence of others. Had Dr. Goff's testimony been considered, there is a "reasonable probability that the advisory jury—and the sentencing judge—'would have struck a different balance.'" *Porter*, 558 U.S. at 42 (quoting *Wiggins*, 539 U.S. at 537). The neglected evidence here is, in other words, "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. *See also Williams*, 529 U.S. at 398 (explaining that evidence of the petitioner's childhood abuse and "the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability");

43

*Glenn v. Tate*, 71 F.3d 1204, 1209–11 (6th Cir. 1995) (holding that the petitioner was prejudiced by trial counsel's failure to present evidence of his low intellectual capacity, particularly because the jury was presented with a report stating that his offense was not the result of "mental retardation").

Although the state's expert, Dr. King, testified that Mr. Reeves was in the borderline range and was not intellectually disabled, this "does not justify discounting [Mr. Reeves'] mitigating evidence." *Debruce*, 758 F.3d at 1277. *See also Porter*, 558 U.S. at 43 (holding that it was not reasonable for the Florida Supreme Court to discount the effect that the petitioner's expert might have had on the jury or the sentencing judge based on the fact that the state's expert provided contradictory testimony). Significantly, some of Dr. King's testimony was consistent with Dr. Goff's, including that Mr. Reeves' full-scale IQ score of 68 indicated significantly subaverage intellectual functioning and that Mr. Reeves had low test scores in certain areas of adaptive functioning.

The state, moreover, "does not point to any additional aggravating evidence that would have been introduced had counsel presented testimony" about Mr. Reeves' intellectual disability. *See id.* And we repeat that the trial court found only one aggravating circumstance and four mitigating circumstances, none of which dealt with Mr. Reeves' intellectual ability. Accordingly, we conclude that "the available mitigating evidence, taken as a whole, might well have influenced the

jury's [or the trial judge's] appraisal" of Mr. Reeves' moral culpability. *See Wiggins*, 539 U.S. at 538 (citation and internal quotation marks omitted).

## V

For the foregoing reasons, we affirm the ruling of the district court as to Mr. Reeves' claim that he is intellectually disabled and thus ineligible for the death penalty. We reverse the ruling of the district court as to Mr. Reeves' claim of ineffective assistance of counsel at the penalty phase and remand to the district court for issuance of the writ in the form of a new capital sentencing hearing for Mr. Reeves.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**